JOHN Y. STOKES et al. v. THE DEPARTMENT OF AGRICULTURE.

*Sale of Fertilizers—Purchase Out of State for Sole Use of Purchaser—Non-Liability to Seizure.*

1. *The Code,* § 2190, prohibits the sale or offering for sale *in this State* of fertilizers until the manufacturer or person importing the same shall obtain a license; it does not prohibit the *use* of them in this State, or the purchase of them in another State to be used for fertilizing purposes by the purchaser himself in this State.

2. Where S., acting for himself and others, resident farmers of this State, ordered from a non-resident manufacturer a number of bags of fertilizer, a given number being ordered for each purchaser, and the same were shipped in separate parcels addressed to the different purchasers, respectively, and separate bills sent to each purchaser, and S., in ordering, acted without compensation, and as an act of courtesy to the other purchasers: *Held,* that the transaction did not come within the inhibition of section 2190 of *The Code,* and the goods were not liable to seizure at the instance of the Department of Agriculture.

This was a CONTROVERSY submitted without action, under *The Code,* § 507, tried before Armfield, J., at July Term, 1889, of the Superior Court of ROCKINGHAM County,

The following is a copy of so much of the case submitted as need be reported:

"1. John Y. Stokes, for himself, and at the instance and request of several persons (plaintiffs herein all belonging to the Farmers' Alliance, but some members of one and some of another Alliance), all residents and farmers in the county and State aforesaid, in the spring of 1889 sent on orders for himself and each of said persons for sixty (60) bags of dissolved bone, to be used in the making of a tobacco fertilizer known as Courts' Formula; and in the orders made, a given number of bags was ordered for himself and a given number of bags for each of said persons, and these bags were so ordered from Wm. Davison & Co., of Baltimore, Maryland, who were the manufacturers of said goods in that State.

" 2. Said Stokes, for himself and the said persons, at the same as ordering the dissolved bone aforesaid, made orders for himself and the said persons for five (5) tons of Boss Fertilizer, four (4) tons of which said Stokes ordered for himself, and the other ton for some one or more of said persons, all ordered from said Davison & Co., of Baltimore, who were manufacturers thereof, both of which were for their own individual use, as aforesaid.

" 3. In ordering said dissolved bone and Boss Fertilizer, the said Stokes acted for himself to the extent set forth above, and for said persons to the extent above set forth as to them, and without any compensation paid or agreed to be paid by them, or any other person, in the way of commissions, reward, or otherwise, but simply and solely in reference to his neighbors as an act of kindness and courtesy to them; and said Stokes in ordering the same made the orders for himself and each of said persons distinctly and separately, indicating therein how much to each, and to whom to be sent, and on whose credit.

" 4. Davison & Co., in pursuance of said orders, in May last, shipped the said dissolved bone and Boss Fertilizer by railroad to Reidsville in parcels, one parcel addressed to Stokes and tagged, and sent also bill for same made out against him, and so likewise the other parcels came addressed to each of said persons—addressed to them separately and tagged separately—and likewise bills were sent against each one for his separate debt.

"5. On the arrival of said articles at Reidsville, the said persons ordering the goods aforesaid, including the said Stokes, all attended at Reidsville prepared with wagons and their money to pay for same and take the same to their respective homes, and then and there the same were seized at the instance of the Inspector of the Agricultural Department for non-payment of license tax required of manufacturers and importers of fertilizers into North Carolina.

" 6. On the seizure of said goods, said Stokes and the said persons—the season of the year being at hand when they must have and use said goods in and about their projected crops of tobacco—agreed with the Agricultural Department that $307 was the value of the goods seized as afore· said, of which amount $145 represented the dissolved bone, and $162 represented the Boss Fertilizer, and that each person present who had ordered the same might pay the value of the shipment to him, making in the aggregate the $307 as aforesaid, into the hands of H. R. Scott as depositee, to be held by him subject to a judicial determination as to the liability of the goods to be seized as aforesaid, and thereupon the money was contributed by each person for his order, and the same, amounting to $307, was paid into the hands of said Scott, where it now is.

" Upon the foregoing facts, it is insisted, on the part of the plaintiffs that, in law, the said goods were liable to no seizure or other demand on the part of the Agricultural Department, and if there be such State law that the same is unconstitutional and void, as being in violation of inter-State commerce.

" The Court gave judgment in favor of the plaintiffs, and the defendant, having excepted, appealed to this Court."

*Messrs. Reid & Reid* and *Dillard & King,* filed a brief for plaintiffs.
*Messrs. C. B. Watson* and *J. C. Buxton,* for defendant.

MERRIMON, C. J.: We are of opinion that the Court below correctly interpreted the statutory provision, under and by virtue of which the defendant claimed authority to seize by its agents the property of the plaintiffs in question. In pertinent respects it (*The Code,* § 2190) provides that "no manipulated guanos, super-phosphate or other commercial fertilizers shall be sold, or offered for sale, *in this State,*

until the manufacturer or person importing the same shall first obtain a license therefor from the Treasurer of the State, for which shall be paid a privilege tax of five hundred dollars *per annum* for each separate brand or quality. Any person, corporation or company who shall violate this chapter, or who shall sell, or offer for sale, any such fertilizer, contrary to the provision above set forth, shall be guilty of a misdemeanor. And all fertilizers so sold, or offered for sale shall be subject to seizure and condemnation," &c. It must be observed that the inhibition of this provision is clearly expressed in plain terms, and extends only to the *sale* of such fertilizers and the offering them for *sale in this State*, without first having obtained a license so to do as prescribed It does not extend to the *use* of them in this State, or the purchase of them in another State to be used for fertilizing purposes by the purchaser himself in this State. The terms employed in the section of the statute recited above and in every section of the chapter, pertinent of which it is a part, unmistakably imply and refer to the *sale* of such fertilizer, and in the offering of them for sale in this State. Nothing appears by terms or by reasonable implication in the statute that at all forbids the mere use of them, or the purchase of them in another State to be used by the purchaser himself. Indeed, the statute (*The Code*, §2203) seems to contemplate that farmers and others may so purchase them. It provides that "any farmer or other person who may buy *without the State* any commercial fertilizer on which the privilege tax of five hundred dollars has been paid, shall be required to report all such purchases to the Register of Deeds of his county," &c. It thus appears that the Legislature did not intend to forbid such purchases. This clause of the statute is peculiar. Why it specifies such purchases of fertilizers, on which the license tax has been paid, and requires the same to be reported does not appear. The provision seems to be imperfect, and,

as it appears, serves no practical purpose. It is brought forward in *The Code* as part of the statute (Acts 1876–'77, ch., 274, § 20), but the latter statute required farmers and others making such purchases in another State to pay "the privilege tax of fifty cents *per ton* as required of dealers." This requirement is omitted from the statute as it now prevails. Why this is so, as we have said, does not appear. It seems that the purpose at first was to encourage farmers and others to patronize such dealers in fertilzers as had paid the license tax. But whatever may have been the purpose of the statutory provision last above recited, it goes to show that it was expected that farmers and others might make purchases of fertilizer for their own use in other States.

In the case before us the plaintiffs did not severally or collectively sell, or offer for sale, in this State, their fertilizer seized by the defendant's agents. They purchased the same in the State of Maryland, to be used by them respectively in this State, not for resale, but upon their farms. This, for the reasons above stated, they might in good faith do.

It is not alleged or suggested that the plaintiffs, or any of them, sought in any way or respect to evade the statute cited. If they had done so, the case would be very different. One of them could not buy fertilizers in another State to re-sell the same to the others in this State, nor could one of them be the agent of a non-resident dealer in such goods, to sell to farmers and others in this State. Each of them could buy such fertilizers by himself, or in good faith by his agent, in another State, for his own use only in this State. All arrangements and devices to evade the statute are violations of it. If the defendant's agents had reason to believe that the plaintiffs, in the purchases they made, acted in bad faith— evasively—they should have so alleged and proved. So far as appears, they acted in good faith and did what they had a right to do.

It was said on the argument, that if the plaintiffs could so purchase fertilizers in another State and bring them into this State for their own use, the statute would not serve, in great measure, the purposes contemplated by it. If it be granted that this is so, the Legislature alone can provide the remedy. Certainly this Court cannot. The purpose of the statute, as expressed in it, is too clear, it seems to us, to admit of question.

What we have said disposes of the case, and we need not advert to other serious questions raised by the assignments of error, and discussed on the argument.

Judgment affirmed.