# PATAPSCO GUANO COMPANY v. NORTH CARO-
# LINA BOARD OF AGRICULTURE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF NORTH CAROLINA.

No. 9. Argued March 3, 4, 1898. — Decided May 31, 1898.

The act of the legislature of North Carolina of January 21, 1891, must be
regarded as an act providing for the inspection of fertilizers and fertiliz-
ing materials in order to prevent the practice of imposition on the people
of the State, and the charge of twenty-five cents per ton as intended
merely to defray the cost of such inspection ; and as it is competent for
the State to pass laws of this character, the requirement of inspection
and payment of its cost does not bring the act into collision with the
commercial power vested in Congress, and clearly this cannot be so as to
foreign commerce, for clause two of section ten of article one expressly
recognizes the validity of state inspection laws, and allows the collection
of the amounts necessary for their execution; and the same principle
must apply to interstate commerce.

THE case is stated in the opinion.

Mr. *Thomas N. Hill* and Mr. *John W. Hinsdale* for appel-
lant.

Mr. *R. H. Battle*, Mr. *J. C. L. Harris* and Mr. *F. H. Bus-
bee* for appellees.

MR. CHIEF JUSTICE FULLER delivered the opinion of the
court.

This was a bill filed in the Circuit Court of the United
States for the Eastern District of North Carolina, April 1,
1892, seeking to enjoin the collection of an inspection charge
of twenty-five cents per ton on commercial fertilizers, as pre-
scribed by an act of the general assembly of North Carolina
of January 21, 1891, and from taking any steps whatever to
enforce that act, on the ground of its unconstitutionality.

The court entered a restraining order, but, on the coming
in of the answer, a motion to continue the injunction until the

hearing was heard on bill, answer, affidavits and exhibits, and denied, and the temporary injunction dissolved. The opinion of the Circuit Court by Seymour, J., is reported in 52 Fed. Rep. 690. Proofs were taken, and a final hearing had at June term, 1893, at Raleigh; the bill was dismissed; and complainants thereupon prosecuted this appeal.

By section fourteen of article nine of the constitution of North Carolina of 1875–76, it was provided that, as soon as practicable after the adoption of that instrument, the general assembly should "establish and maintain, in connection with the University, a Department of Agriculture, of Mechanics, of Mining and of Normal Instruction."

By an act of March 12, 1877, (Laws N. C. 1876–77, 506, c. 274,) such a department was established, and, among other things, the subject of commercial fertilizers dealt with. By the eighth section, manipulated guanos, superphosphates or other commercial fertilizers were forbidden to be sold or offered for sale, until the manufacturer or person importing the same had obtained a license therefor on payment of a privilege tax of five hundred dollars per annum for each separate brand or quality.

By section nine, every bag, barrel or other package of such fertilizer offered for sale was required to have thereon a label or stamp setting forth the name, location and trade-mark of the manufacturer; the chemical composition of the contents, and the real percentage of certain specified ingredients; and that the privilege tax had been paid. By section ten, the board was empowered to collect samples for analysis; by section eleven, to require railroad and steamboat companies to furnish monthly statements of the quantity of fertilizers transported; and by section twelve, to establish an agricultural experiment and fertilizer central station in connection with the chemical laboratory of the University, and the trustees of the University, with the approval of the board, were directed to employ an analyst, skilled in agricultural chemistry, whose duty it should be "to analyze such fertilizers and products as may be required by the Department of Agriculture, and to aid as far as practicable in suppressing fraud in the sale of com-

mercial fertilizers;" and whose salary was to be paid "out·of the funds of the Department of Agriculture."

The sections bearing on this subject were carried forward in the code of 1883, volume II, c. 1, §§ 2190 *et seq.*

In August, 1890, the Circuit Court for the Eastern District of North Carolina, Bond and Seymour, JJ., held that section 2190 of the code, declaring that no commercial fertilizers should be sold or offered for sale until the manufacturer or importer obtained a license from the treasurer of the State, for which should be paid a privilege tax of five hundred dollars per annum for each separate brand, was in violation of the Federal Constitution and void. *American Fertilizing Co.* v. *Board of Agriculture of North Carolina,* 43 Fed. Rep. 609.

Thereupon, by the act of January 21, 1891, Laws 1891, 40, c. 9, volume II, c. 1 of the code was amended, and sections 2190, 2191 and 2193 were made to read as follows:

"SEC. 2190. For the purpose of defraying the expenses connected with the inspection of fertilizers and fertilizing materials in this State there shall be a charge of twenty-five cents per ton on such fertilizers and fertilizing material for each fiscal year ending November thirtieth, which shall be paid before delivery to agents, dealers or consumers in this State: *Provided,* the board shall [have] the discretion to exempt certain natural material as may be deemed expedient. Each bag, barrel or other package of such fertilizers or fertilizing materials shall have attached thereto a tag stating that all charges specified in this section have been paid, and the state Board of Agriculture is hereby empowered to prescribe a form for such tags, and to adopt such regulations as will enable them to enforce this law. Any person, corporation or company who shall violate this chapter, or who shall sell or offer for sale any such fertilizers or fertilizing material contrary to the provisions above set forth, shall be guilty of a misdemeanor, and all fertilizers or fertilizing materials so sold or offered for sale shall be subject to seizure and condemnation in the same manner as provided in this chapter for the seizure and condemnation of spurious fertilizers, subject, how-

ever, to the discretion of the Board of Agriculture to release the fertilizers so seized and condemned upon the payment of the charge above specified and all costs and expenses incurred by the department in such proceeding: *Provided*, that tags shall be attached by manufacturers, agents or dealers to all fertilizers now in the State; those protected under license previously issued shall be furnished free of charge.

"SEC. 2191. Every bag, barrel or other package of such fertilizers or fertilizing materials as above designated offered for sale in this State shall have thereon plainly printed a label or stamp, a copy of which shall be filed with the Commissioner of Agriculture, together with a true and faithful sample of the fertilizer or fertilizing material which it is proposed to sell, at or before delivery to agents, dealers or consumers in this State and which shall be uniformly used and shall not be changed during the fiscal year for which tags are issued, and the said label or stamp shall truly set forth the name, location and trade-mark of the manufacturer; also the chemical composition of the contents of such package, and the real percentage of any of the following ingredients asserted to be present, to wit, soluble and precipitated phosphoric acid, which shall not be less than eight per cent; soluble potassa, which shall not be less than one per cent; ammonia, which shall not be less than two per cent, or its equivalent in nitrogen; together with the date of its analyzation, and that the requirements of the law have been complied with; and any such fertilizer as shall be ascertained by analysis not to contain the ingredients and percentage set forth as above provided shall be liable to seizure and condemnation as hereinafter prescribed, and when condemned shall be sold by the board of agriculture for the exclusive use and benefit of the department of agriculture."

Section 2192 refers to the proceedings to condemn.

"SEC. 2193. Any merchant, trader, manufacturer or agent who shall sell or offer for sale any commercial fertilizer or fertilizing material without having such labels, stamps and tags as hereinbefore provided attached thereto, or shall use the required tag the second time to avoid the payment of the

tonnage charge, or if any person shall remove any such fertilizer, (he) shall be liable to a fine of ten dollars for each separate bag, barrel or package sold, offered for sale or removed, to be sued for before any justice of the peace and to be collected by the sheriff by distress or otherwise, one half less the costs to go to the party suing and the remaining half to the department; and if any such fertilizer shall be condemned as herein provided it shall be the duty of the department to have an analysis made of the same and cause printed tags or labels expressing the true chemical ingredients of the same put upon each bag, barrel or package, and shall fix the commercial value thereof at which it may be sold; and any person who shall sell, offer for sale or remove any such fertilizers, or any agent of any railroad or other transportation company who shall deliver any such fertilizer in violation of this section shall be guilty of a misdemeanor."

Section 2196, which corresponded to section 12 of the act of March 12, 1877, was amended by the substitution of the word "control" for the word "central," and read as follows:

"SEC. 12. The department of agriculture shall establish . . . an agricultural experiment and fertilizer control station, and shall employ an analyst, skilled in agricultural chemistry. It shall be the duty of said chemist to analyze such fertilizers and products as may be required by the department of agriculture, and to aid as far as practicable in suppressing fraud in the sale of commercial fertilizers. He shall, also, under the direction of said department, carry on experiments on the nutrition and growth of plants, with a view to ascertain what fertilizers are best suited to the various crops of this State; and whether other crops may not be advantageously grown on its soil, and shall carry on such other investigations as the said department may direct. He shall make regular reports to the said department, of all analyses and experiments made, which shall be furnished, when deemed needful, to such newspapers as will publish the same. . . . His salary shall be paid out of the funds of the department of agriculture."

The following was substituted for section 2205: "Whenever

any manufacturer of fertilizers or fertilizing materials shall have paid the charges hereinbefore provided his goods shall not be liable to any further tax whether by city, town or county."

Section 2208 remained unamended, and provided: "All moneys arising from the tax on licenses, from fines and forfeitures, fees for registration and sale of lands not herein otherwise provided for, shall be paid into the state treasury and shall be kept on a separate account by the treasurer as a fund for the exclusive use and benefit of the department of agriculture."

The various errors assigned question the decree on the grounds, in general, that the court should have held the act of January 21, 1891, to be in violation of the third clause of section eight, and of the second clause of section ten, of article one of the Constitution of the United States; that the charge required to be paid was so excessive that the act could not be sustained as a legitimate inspection law; or as a valid exercise of the police power; and that it was neither, because it was not limited to articles produced in the State, and because it did not relate to the health, morals or safety of the community.

The second clause of section 10 of article I of the Constitution reads: "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts, laid by any State on imports or exports, shall be for the use of the Treasury of the United States; and all such laws shall be subject to the revision and control of the Congress."

The words "imports" and "exports," as therein used, have been held to apply only to articles imported from, or exported to, foreign countries. *Woodruff* v. *Parham*, 8 Wall. 123; *Pittsburg & Southern Coal Company* v. *Louisiana*, 156 U. S. 590, 600.

The clause recognized that the inspection of such articles may be required by the States, and that they may lay duties on them to pay the expense of such inspections, but as it

would be difficult, if not impossible, to determine the neces-
sary amount with exactness and to remove any inducement to
excess, it was provided that any surplus should be paid to the
United States.  As such laws are subject to the revision and
control of Congress, it has been suggested that whether in-
spection charges are excessive or not might be for Congress to
determine and not the courts, which would also be so where
inspection laws operate on interstate as well as foreign com-
merce.  *Neilson* v. *Garza*, 2 Woods, 287; *Turner* v. *Mary-
land*, 107 U. S. 38.

Considered as an inspection law and as not open to attack
as in contravention of that clause, the questions still remain
whether an inspection law can operate on importations as
well as exportations; and whether in this instance the charge
was so excessive as to deprive the act of its character as an
inspection law or as a legitimate exercise of protective gov-
ernmental power, and make it a mere revenue law obnoxious
to the objection of being an unlawful interference with inter-
state commerce.  Counsel for plaintiff in error insists that
this result is deducible from the legislation of North Carolina
making appropriations from the funds of the department of
agriculture received from the charge on fertilizers or fertiliz-
ing materials; as also from the evidence submitted on the
hearing.

It will be more convenient to first dispose of the latter con-
tention.

By section 2206 of the code of 1883, the board of agri-
culture was directed to " appropriate annually, of the money
received from the tax on fertilizers, the sum of five hundred
dollars for the benefit of the North Carolina Industrial Asso-
ciation, to be expended under the direction of the board of
agriculture."

By chapter 308 of the laws of 1885, Laws, N. C. March
11, 1885, 553, the establishment of an industrial school was
provided for, to the establishment and maintenance of which
the board was directed by the fourth section to apply their
surplus funds, not exceeding five thousand dollars annually.

By chapter 410 of the laws of 1887, Laws, N. C. March 7,

1887, 718, the name of the industrial school was changed to "The North Carolina College of Agriculture and Mechanic Arts," and the board was required by section six to turn over to that institution annually "the whole residue of their funds from licenses on fertilizers remaining over and not required to conduct the regular work of that department."

But by chapter 348 of the laws of 1891, Laws, N. C. March 6, 1891, 404, the provision last above given was stricken out, and by section five of the act $10,000 for the year 1891 and $10,000 for the year 1892 were appropriated to the college; and by chapter 426 of the laws of 1891, Laws, N. C. March 7, 1891, 491, an annual appropriation of five hundred dollars was made to the North Carolina Industrial Association. These appropriations were made from the state treasury, and both acts contained the usual repealing clauses.

By section 2198 and subsequent sections of the act of 1883, the geological survey of the State, the geological museum, the appointment of the state geologist, and matters pertaining thereto, were dealt with, and various expenditures connected therewith were authorized to be paid out of the general fund of the agricultural department, the sources of which were apparently not confined to what might be derived from the license tax in respect of fertilizers.

By chapter 409 of the laws of 1887, (Laws, 1887, 714,) so much of the sections of the act pertaining to the state geologist as required the department to fix the compensation, to regulate the expenditures, or pay out of their funds the salary and expenses of the state geologist, was repealed.

Section fourteen of this act empowered the department to expend from the amount arising from the tax on fertilizers for 1887–88, the expenses for the completion of the oyster survey; but by chapter 338 of the laws of 1891, (Laws, 1891, 369,) provision was made for defraying the expenses of the regulation of the oyster industries of the State from other sources.

We agree entirely with the Circuit Court that the legislation of 1891 not only amended the code in the matter of the requirement of the privilege tax of five hundred dollars,

but repealed all laws making any substantial diversion of the money to be derived from the charge on fertilizers of twenty-five cents per ton, to any other purposes than those connected with the necessary expenses of inspection. It is ingeniously argued that as section 6 of chapter 410 of the laws of 1887 repealed by substitution section 4 of chapter 308 of the laws of 1885, the repeal thereof by chapter 348 of the laws of 1891 revived the latter section, and hence that $5000 of the amount arising from the present charge on fertilizers became appropriated to the industrial school, it being asserted that the funds of the department were in fact derived therefrom; and also that the appropriation out of the state treasury of five hundred dollars to the industrial association by chapter 426 of the laws of 1891 was an additional appropriation, and did not repeal section 2206 of the code, which directed the board of agriculture to appropriate that sum to that association.

These positions do not commend themselves to our judgment. As to the appropriation of five hundred dollars, we think, under the circumstances, that it was intended to be in lieu of the former appropriation of that amount; and as to the revival of the act of 1885 by the repeal of the repealing act of 1887, we regard the doctrine that the repeal of a repealing act revives the first act as wholly inapplicable. In our opinion such a conclusion would be opposed to the obvious legislative intention in the enactment of the law of 1891. This act imposed a charge of twenty-five cents per ton on commercial fertilizers, and the purpose of the charge was declared to be to defray the expenses of inspection only. The previous laws had imposed a tax of five hundred dollars per brand upon every brand and description of fertilizer, and declared the same to be a privilege tax. It is impossible to impute to the general assembly the intention, in repealing parts of the code which had been declared unconstitutional, to revive earlier laws which might render the amended law liable to the same objections.

Entertaining these views of the legislative intention, it does not appear to us that evidence tending to show that money

collected from this source was applied to other than the purposes for which it was received should be entered into on this inquiry into the validity of the act. If the receipts are found to average largely more than enough to pay the expenses, the presumption would be that the legislature would moderate the charge. But treating the question whether the charge of twenty-five cents per ton was shown to be so excessive as to demonstrate a purpose other than that which the law declared, as a judicial question we are satisfied that comparing the receipts from this charge with the necessary expenses, such as the cost of analyses, the salaries of inspectors, the cost of tags, express charges, miscellaneous expenses of the department in this connection, and so on, we cannot conclude that the charge is so seriously in excess of what is necessary for the objects designed to be effected, as to justify the imputation of bad faith and change the character of the act.

Inspection laws are not in themselves regulations of commerce, and while their object frequently is to improve the quality of articles produced by the labor of a country and fit them for exportation, yet they are quite as often aimed at fitting them, or determining their fitness, for domestic use, and in so doing protecting the citizen from fraud. Necessarily, in the latter aspect, such laws are applicable to articles imported into, as well as to articles produced within, a State.

Clause two of section ten expressly allows the State to collect from imports as well as exports the amounts necessary for executing its inspection laws, and Chief Justice Marshall expressed the opinion in *Brown* v. *Maryland* that imported as well as exported articles were subject to inspection.

The observations of Mr. Justice Bradley, on circuit, in *Neilson* v. *Garza*, are quite apposite on this and other points under discussion, and may profitably be quoted.

That case involved the validity of a law of the State of Texas, providing for the inspection of hides, and Mr. Justice Bradley said:

"If the state law of Texas, which is complained of, is really an inspection law, it is valid and binding unless it interferes

with the power of Congress to regulate commerce, and if it does thus interfere, it may still be valid and binding until revised and altered by Congress.  The right to make inspection laws is not granted to Congress, but is reserved to the States; but it is subject to the paramount right of Congress to regulate commerce with foreign nations, and among the several States; and if any State, as a means of carrying out and executing its inspection laws, imposes any duty or impost on imports or exports, such impost or duty is void if it exceeds what is absolutely necessary for executing such inspection laws. How the question, whether a duty is excessive or not, is to be decided, may be doubtful.  As that question is passed upon by the state legislature, when the duty is imposed, it would hardly be seemly to submit it to the consideration of a jury in every case that arises.  This might give rise to great diversity of judgment, the result of which would be to make the law constitutional one day, and in one case, and unconstitutional another day, in another case.  As the article of the Constitution which prescribes the limit goes on to provide that 'all such laws shall be subject to the revision and control of Congress,' it seems to me that Congress is the proper tribunal to decide the question, whether a charge or duty is or is not excessive.  If, therefore, the fee allowed in this case by the state law is to be regarded as in effect an impost or duty on imports or exports, still if the law is really an inspection law, the duty must stand until Congress shall see fit to alter it.

" Then we are brought back to the question whether the law is really an inspection law.  If it is, we cannot interfere with it on account of supposed excessiveness of fees.  If it is not, the exaction is clearly unconstitutional and void, being an unauthorized interference with the free importation of goods. The complainant contends that it is not an inspection law; that inspection laws only apply legitimately to the domestic products of the country, intended for exportation; and that no inspection is actually required in this particular case, but a mere examination to see if the hides are marked, and who imported them, etc., duties which belong to the entry of goods, and not their inspection.

" No doubt the primary and most usual object of inspection is to prepare goods for exportation in order to preserve the credit of our exports in foreign markets.    Chief Justice Marshall, in *Gibbons* v. *Ogden*, says : ' The object of inspection laws is to improve the quality of articles produced by the labor of a country ; to fit them for exportation, or it may be, for domestic use.'    9 Wheat. 203 ; Story on the Const., § 1017. But in *Brown* v. *Maryland*, he adds, speaking of the time when inspection takes place: ' Inspection laws, so far as they act upon articles for exportation, are generally executed on land before the article is put on board a vessel ; so far as they act upon importations, they are generally executed upon articles which are landed.    The tax or duty of inspection is a tax which is frequently, if not always, paid for service performed on land.'    12 Wheat. 419 ; Story on the Const., § 1017.    So that, according to Chief Justice Marshall, imported as well as exported goods may be subject to inspection ; and they may be inspected as well to fit them for domestic use as for exportation.

" All housekeepers who are consumers of flour know what a protection it is to be able to rely on the inspection mark for a fine or superior article.    Bouvier defines inspection as the examination of certain articles made by law subject to such examination, so that they may be declared fit for commerce.    Law Dict. *verb.* ' Inspection.'    The removal or destruction of unsound articles is undoubtedly, says Chief Justice Marshall, an exercise of that power.    *Brown* v. *Maryland, supra ;* Story on the Const., § 1024.    ' The object of the inspection laws,' says Justice Sutherland, ' is to protect the community, so far as they apply to domestic sales, from frauds and impositions ; and in relation to articles designed for exportation, to preserve the character and reputation of the State in foreign markets.'    *Clintsman* v. *Northrop*, 8 Cowen, 46.    It thus appears that the scope of inspection laws is very large, and is not confined to articles of domestic produce or manufacture, or to articles intended for exportation, but applies to articles imported, and to those intended for domestic use as well."    2 Woods, 287, 289.

But in *Turner* v. *Maryland*, 107 U. S. 38, which related only to the laws of Maryland so far as providing for the prep-

aration for exportation of tobacco grown in the State, any opinion as to the provisions of those laws referring to the inspection of tobacco grown out of Maryland was expressly reserved.

In *Voight* v. *Wright*, 141 U. S. 62, 65, a statute of Virginia relating to the inspection of flour brought into that Commonwealth was held to be unconstitutional, because it required the inspection of flour from other States when no such inspection was required of flour manufactured in Virginia, an objection to which the act under consideration is not open, for the inspection and payment of its cost are required in respect of all fertilizers, whether manufactured in the State or out of it, and it is conceded that fertilizers are manufactured in North Carolina, as, indeed, their many laws incorporating companies for the purpose of so doing plainly indicate.    Mr. Justice Bradley in that case remarked that the question was "still open as to the mode and extent in which state inspection laws can constitutionally be applied to personal property imported from abroad, or from another State, — whether such laws can go beyond the identification and regulation of such things as are strictly injurious to the health and lives of the people, and therefore not entitled to the protection of the commercial power of the government, as explained and distinguished in the case of *Crutcher* v. *Kentucky, ante,* 47, just decided."

Whenever inspection laws act on the subject before it becomes an article of commerce they are confessedly valid, and also when, although operating on articles brought from one State into another, they provide for inspection in the exercise of that power of self-protection commonly called the police power.

No doubt can be entertained of this where the inspection is manifestly intended, and calculated in good faith, to protect the public health, the public morals, or the public safety. *Minnesota* v. *Barber,* 136 U. S. 313.    And it has now been determined that this is so, if the object of the inspection is the prevention of imposition on the public generally.

In *Plumley* v. *Massachusetts,* 155 U. S. 461, it was decided that a statute of Massachusetts "to prevent deception in the

manufacture and sale of imitation butter," in its application to the sale of oleomargarine artificially colored so as to cause it to look like yellow butter, and brought into Massachusetts, was not in conflict with the clause of the Constitution of the United States investing Congress with power to regulate commerce among the several States. That decision explicitly rests on the ground that the statute sought to prevent a fraud upon the general public. It is true that an article of food was involved, but the sole ground of the decision was that the State had the power to protect its citizens from being cheated in making their purchases, and that thereby the commercial power was not interfered with. *Schollenberger* v. *Pennsylvania,* 171 U. S. 1.

Where the subject is of wide importance to the community, the consequences of fraudulent practices generally injurious, and the suppression of such frauds matter of public concern, it is within the protective power of the State to intervene. Laws providing for the inspection and grading of flour, the inspection and regulation of weights and measures, the weighing of coal on public scales, and the like, are all competent exercises of that power, and it is not perceived why the prevention of deception in the adulteration of fertilizers does not fall within its scope.

It is apparent that there is no article entering into common use in many of the States, and particularly the Southern States, the inspection of which is so necessary for the protection of those citizens engaged in agricultural operations, as commercial fertilizers. Certain ingredients, as ammonia or nitrogen, phosphoric acid and potash, make up the larger part of the value of these fertilizers, and without the aid of scientific analysis, the amount of these ingredients cannot be ascertained nor whether the fertilizer sold is of a uniform grade. The average farmer was compelled, without an analysis, to depend on his sense of smell, or his success, or failure, during the previous year with the same brand or name, to determine the relative amounts of the essential ingredients, and the value of the materials. To protect agricultural interests against spurious and low grade fertilizers was the object

of this law, which simply imposed the actual cost of inspection, necessarily varying with the agricultural condition of the various years. The label or tag could only be furnished after an analysis, the result of which was therein stated. In that light, the law practically required an analysis in every case, and was sustained as so doing by the Supreme Court of North Carolina in *State* v. *Norris,* 78 N. C. 443.

The act of 1877, requiring the obtaining of a license to sell fertilizers on the payment of a privilege tax of five hundred dollars, was considered in that case, at January term, 1878, of that court, and held valid under the state constitution as intended to protect the public from being imposed on by adulterated fertilizers, and to keep the traffic in the hands of responsible parties, making the means to that end self-sustaining by the license tax. And it was also decided that the law was not in conflict with the Federal Constitution on the authority of *Woodruff* v. *Parham,* 8 Wall. 123, and *Hinson* v. *Lott,* 8 Wall. 148.

As before remarked, the sections of the act of 1877 relating to this subject were carried forward into the code of 1883, and section 2190 required the license and imposed the privilege tax.

In *Stokes* v. *Department of Agriculture,* 106 N. C. 439 (1890), the Supreme Court held that section 2190, in prohibiting the sale, or the offering for sale, of fertilizers in North Carolina until the manufacturer or person importing the same should obtain a license, did not prohibit the use of them in the State, nor the purchase of them in another State, to be used for fertilizing purposes by the purchaser himself in North Carolina; and that, where a person acting for himself and others, resident farmers of the State, ordered from a non-resident manufacturer a number of bags of fertilizer, a given number being ordered for each purchaser, and the same was shipped in separate parcels, addressed to different purchasers separately, and separate bills sent to each purchaser, there being no intent to evade the statute, the transaction did not come within the inhibition of section 2190, and the goods were not liable to seizure at the instance of the department of agriculture.

Similar laws of other States, regulating the sale of fertilizers, have been sustained on the same ground.

In *Steiner* v. *Ray*, 84 Alabama, 93, it was held that a statute regulating the sale of commercial fertilizers, when its controlling purpose was to guard the agricultural public against spurious and worthless compounds sometimes sold as fertilizers, and to furnish to buyers cheap and reliable means of proving the deception and fraud, should such be attempted, was strictly within the pale of police regulation and was constitutional. And this case was cited with approval in *Kirby* v. *Huntsville Fertilizer &c. Co.*, 105 Alabama, 529, where it was ruled that the sale of commercial fertilizers was void unless each sack, parcel or package was tagged as required by statute at the time the right of property passed from the vendor to the vendee.

In *Vanmeter* v. *Spurrier*, 94 Kentucky, 22, an act of Kentucky, "to regulate the sale of fertilizers in this Commonwealth, and to protect agriculturists in the purchase and use of the same," was sustained; and it was held that the statute could not be fairly construed to authorize the levy of an impost on interstate commerce beyond what was necessary to inspection. The court said: "The statute, as its title indicates, was enacted for protection of farmers of this Commonwealth against fraud and imposition of those having for sale commercial fertilizers. To accomplish that object, each one selling, or offering for sale, any fertilizer is required to submit a sample for analysis and test of its quality at the Experimental Station. For that purpose only can the fees collected by the director be used, and in that way and to that extent only can farmers of the Commonwealth be benefited by the statute. In our opinion the law is valid in every respect."

In *Faircloth* v. *De Leon*, 81 Georgia, 158; *Goulding Fertilizer Company* v. *Driver*, 25 S. E. Rep. 922, and other cases, the Supreme Court of Georgia has held that the seller of commercial fertilizers, which had not been inspected as the law required, could not maintain against the buyer an action for the price; but in *Martin* v. *Upshur Guano Company*, 77

Georgia, 257, that the statute was not applicable where sale and delivery were without the State.

The act of January 21, 1891, must be regarded, then, as an act providing for the inspection of fertilizers and fertilizing materials in order to prevent the practice of imposition on the people of the State, and the charge of twenty-five cents per ton as intended merely to defray the cost of such inspection. It being competent for the State to pass laws of this character, does the requirement of inspection and payment of its cost bring the act into collision with the commercial power vested in Congress? Clearly this cannot be so as to foreign commerce, for clause two of section ten of article one expressly recognizes the validity of state inspection laws, and allows the collection of the amounts necessary for their execution; and we think the same principle must apply to interstate commerce.

In any view, the effect on that commerce is indirect and incidental, and "the Constitution of the United States does not secure to any one the privilege of defrauding the public."

*Decree affirmed.*

MR. JUSTICE HARLAN and MR. JUSTICE WHITE dissented.