### GULF FISHERIES CO. v. DARROUZET.

(District Court, S. D. Texas, Galveston Division. December 22, 1926.)

No. 122.

1. Commerce ⬥77—Fish brought from sea or foreign waters are "imports," not dutiable by state (Const. art. 1, § 10).

Fish caught in open sea or foreign waters and brought into the United States are "imports," within Const. art. 1, § 10, prohibiting states from laying duty on imports.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Imports.]

2. Commerce ⬥51—Tax imposed on wholesale fish dealers held valid as inspection fee (Vernon's Sayles' Ann. Civ. St. 1914, arts. 3987, 3989).

Under Texas Game and Fish Law (Vernon's Sayles' Ann. Civ. St. 1914, arts. 3987, 3989), requiring wholesale dealers in game, fish and oysters to procure a license, for which they shall pay a tax of $1 for every 1,000 pounds of fish handled, and providing that their places and products shall be subject to inspection, the tax *held* valid as an inspection fee, as applied to a dealer which brings its fish from the sea.

In Equity. Suit by the Gulf Fisheries Company against John L. Darrouzet. On application for injunction. Denied.

Brantly Harris, of Galveston, Tex., for plaintiff.

D. B. MacInerney, Co. Atty., of Galveston, Tex., Dan Moody, Atty. Gen. of Texas, and C. A. Wheeler, Asst. Atty. Gen. of Texas, for defendant.

Before FOSTER, Circuit Judge, and WEST and HUTCHESON, District Judges.

HUTCHESON, District Judge. This is a suit before a three-judge court, brought to restrain the county attorney and the authorities of the state of Texas from prosecuting the plaintiff for pursuing the business of handling fish without securing a wholesale dealers' license, as provided by the statutes of Texas, and paying the tax on products handled by them as such wholesale dealers. The case is submitted on an agreed statement as follows:

The Gulf Fisheries Company, plaintiff, is a corporation organized under the laws of the state of New York, with a permit to do business in the state of Texas, and with its place of business in Galveston. The plaintiff is engaged in the business of catching fish on its own vessels, some of said fish being caught at open sea, but most of the fish being caught in foreign waters, and bringing said fish into Galveston, Tex., on the same boats that said fish are caught; said fish consisting mostly of red snappers and other fish.

That, after catching said fish as aforesaid, plaintiff brings said fish on its vessels to the port of Galveston, where it is accorded wharf privileges by the Galveston Wharf Company, such as are necessary to the conduct of business in unloading fish from the boats and loading same on express cars, and such space as is necessary in handling the office work incident thereto. In the handling of said fish, plaintiff has several large bins or ice boxes for the storage and handling and re-icing of said fish.

That said fish are unloaded by the plaintiff from the vessels of plaintiff in Galveston, Tex., and are at said place weighed and washed. All the fish are at said place weighed and washed, and approximately 75 per cent. are beheaded and gutted, and from 7 to 10 per cent. are gutted and gilled, with heads left on, and the remainder are sold without beheading or removing gills or entrails. Said fish are re-iced at said place, and are put with ice in barrels for shipments in filling orders, except 15 or 20 per cent., which are sold within the city of Galveston to wholesale dealers. Said fish are not cooked or treated in any manner, but are shipped to purchasers in the same condition as when caught, excepting that said fish are washed, and the heads and entrails are removed, as before stated, and then such fish, with fresh ice, are placed loose in barrels and so shipped. There are many wholesale dealers in fish in Texas, whose business is the buying of fish from the Gulf Fisheries Company and similar concerns and reselling same at retail.

After said fish are brought into Galveston as aforesaid, they are immediately re-iced, to keep said fish from spoiling and handled as above set forth. About 25 per cent. of fish brought in are shipped to states other than Texas by railway express and by freight.

That plaintiff has several large ice boxes on the wharf where fish are unloaded; that none of said fish are stored in cold storage plants in the city, but are shipped out of Galveston as fast as said fish can be re-iced, washed, and handled as above stated, and loaded in express cars; and that practically all of said fish are shipped the day said fish are unloaded from the boats on which they are brought into Galveston. On a few occasions fish have been held in said ice boxes on plaintiff's premises for more than 48 hours, but this is an exception to the rule.

Plaintiff sells no fish at retail, at its place of business or elsewhere, but sells all fish in the manner and place above stated, in large quantities, to such persons as wholesale dealers in quantities of 50 pounds and up; about 400 pounds being the average order.

Plaintiff has, on the demand of the game, fish, and oyster commissioner of the state of Texas, taken out a wholesale fish dealer's license, but has refused to pay the tax of $1 per 1,000 pounds of fish sold by plaintiff at the place and in the manner above stated; this tax covering fish sent to other states, as well as fish sold in Texas. The defendant herein will prosecute all plaintiff's agents and employees, unless the tax of $1 per 1,000 pounds of fish is paid, said license being $1 for each 1,000 pounds of fish handled by the plaintiff, and defendant has already filed criminal proceedings against one of the plaintiff's employees, and will continue to do so until the tax is paid.

The tax imposed appears in title 63, Game, Fish, Oysters, etc., of the Statutes of the State of Texas, a system of laws for the protection of fish and game. Among other provisions of the title are article 3987, Ver-

non's Sayles' Ann. Civ. St. 1914, providing that for the better protection of the fish and oyster industry every person who may engage in the business of wholesale dealer shall procure from the game, fish, and oyster commissioner a license; for the purpose of obtaining this license the applicant must agree that all products bought or sold, or had for sale by him shall all be subject to inspection of the game, fish and oyster commissioner, and he shall authorize the commissioner to enter his place of business at any time to inspect the same; and article 3989, Vernon's Sayles' Ann. Civ. St. 1914, which provides that, the application for the license having been duly executed and delivered to the commissioner, it shall then be the duty of the commissioner, if the application complies with the law, to issue a license, for which license the applicant shall pay a tax of $1 for each 1,000 pounds of fish handled by him. Failure to pay the tax authorizes the forfeiture of the license, and also it is provided that failure to pay the tax shall constitute a misdemeanor, for which the person offending will be prosecuted and punished as provided by law.

Plaintiff defends against compliance with the law on the ground that the fish constitute imports; that the tax is a tax on imports, and therefore in contravention of article 1, § 10, of the Constitution. The defendant replies: (1) That fish are not imports, because fish, being feræ naturæ, are not the subject of private property, and therefore are not within the inhibitions of the invoked provision of the Constitution; (2) that, if the fish are in their nature imports, in this particular case they have become so mingled with the common mass of property in the state as to lose their character as such, and therefore their exemption; and (3) that, conceding them to be imports, the tax is levied and is necessary for inspection purposes to protect the fish and game, and therefore is levied under direct authority of the Constitution.

[1] Considering these contentions in their order, we think as to the first contention it is sufficient to say that the Constitution prohibits taxes on imports, that these fish certainly are imports (that is, objects or things brought into the United States), and that whether they are articles of commerce in the ordinary sense is wholly immaterial. The word "import," used in statutes, has been given the broadest construction. See United States v. Sischo, 262 U. S. 165, 43 S. Ct. 511, 67 L. Ed. 925.

[2] The second contention involves a delicate question of construction, which is not made less difficult by the state of the decisions on the point, and we do not find it necessary to hazard an opinion on it, because the case in our view is controlled by answering the third contention, whether the tax can be sustained as an inspection tax, in view of the nature of the subject-matter and the structure of the statutes, for, if it can be, then the tax is valid and injunction should be denied. It is settled law that the state has the widest powers over, not only the taking, but the handling, of fish and game within its borders. People v. Lassen, 142 Mich. 597, 106 N. W. 143; People v. O'Neil, 110 Mich. 324, 68 N. W. 227, 33 L. R. A. 696; People v. Booth Fisheries Co., 253 Ill. 423, 97 N. E. 837; Silz v. Hesterberg, 211 U. S. 31, 29 S. Ct. 10, 53 L. Ed. 75.

In Silz v. Hesterberg the Supreme Court held a law of the state of New York making it unlawful to possess game during the closed season valid as against a dealer in imported game, who had in his possession during the closed season the dead body of an imported bird. If the state has power to regulate the importation of fish and game in the interest of the protection of its own fish and game, it certainly has the power to levy an inspection tax to carry out that purpose. This we think cannot be questioned. It remains only to consider whether the tax can be reasonably referred to that head.

It is established by the decisions that a presumption is indulged in favor of the legality and correctness of legislative action looking to the levy of an inspection tax, and that any tax levied by the Legislature, which appears upon examination reasonably proportionate to the purposes and objects of inspection, must be sustained. Red C. Oil Co. v. Board of Agriculture (C. C.) 172 F. 695; Patapsco Guano Co. v. North Carolina, 171 U. S. 345, 18 S. Ct. 862, 43 L. Ed. 191; New Mexico v. Denver & Rio Grande Ry., 203 U. S. 38, 27 S. Ct. 1, 51 L. Ed. 78; Red C. Oil Co. v. North Carolina, 222 U. S. 381, 2 S. Ct. 152, 56 L. Ed. 240; D. E. Foote & Co. v. Stanley, 232 U. S. 495, 34 S. Ct. 377, 58 L. Ed. 698.

Considering the tax in question in the light of these authorities, having in mind its purposes and objects, we have no hesitation in finding that the tax is properly laid as an inspection tax, and that it is therefore strictly within the constitutional provision, and that the injunction should be denied.