HILL PACKING COMPANY, Plaintiff, v. CITY OF NEW YORK
et al., Defendants.

Supreme Court, Special Term, New York County, June 18, 1945.

*Arnold J. Brock* and *William P. Balaban* for plaintiff.

*Ignatius M. Wilkinson, Corporation Counsel (Richard L. Baltimore, Jr.,* of counsel), for defendants.

SHIENTAG, J. This action is one for a declaratory judgment adjudicating that an amendment to section 327 of the Sanitary Code of the City of New York, adopted by the Board of Health on August 10, 1943, is unconstitutional. The amendment in question constitutes subdivision 4 of section 327, and reads as follows: " 4. Horseflesh, whether alone or combined with other ingredients, intended for animal feed shall not be brought into The City of New York, transported, or held, kept, stored, or offered for sale or sold unless decharacterized by harmless coloring or otherwise in a manner and with materials satisfactory to the Department of Health. This provision, however, shall not apply to horseflesh sold and transported to the New York Zoological Society or the Park Department of The City of New York."

An application which was made by the plaintiff for a temporary injunction was granted by Mr. Justice KOCH, sitting at Special Term, on June 20, 1944. (*Hill Packing Co.* v. *City of New York,* 182 Misc. 742.) In a carefully reasoned opinion he held that the amendment was unconstitutional on the following grounds: that it was indefinite; that it was discriminatory; that it was violative of due process and was not justifiable under the police power; and that it was an unlawful interference with interstate commerce. No appeal was taken from that decision.

The conclusions I reach after trial are as follows:

1. The amendment in controversy is not void for indefiniteness. To be sure, "decharacterization" is a coined word and does not seem to carry any prior scientific or technical meaning. The object of the section, however, is apparent: to require some physical treatment of the horse meat that will prevent its confusion with beef. One method of so doing is specifically mentioned: "harmless coloring". The fact that the Board of Health may allow alternative methods of "decharacterization" does not taint the requirement with indefiniteness or uncertainty. (*Connally* v. *General Const. Co.,* 269 U. S. 385, 391; *Whitney* v. *California,* 274 U. S. 357; *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, 502; *Omaechevarria* v. *Idaho,* 246 U. S. 343, 345; *People* v. *Grogan,* 260 N. Y. 138.)

2. The amended section is not discriminatory. There is no discrimination against interstate commerce. An exception is made for horseflesh sold to the Zoological Society or to the Park Department. This, on its face, is a reasonable classification, in view of the object of the provision, which is to prevent the perpetration of fraud in the sale of horse meat.

3. The amended section is an unlawful interference with interstate commerce, in a national field, in which Congress has enacted detailed appropriate legislation. It will be assumed for the purpose of this decision that unless limited by the exercise of Federal power, under the commerce clause, the municipality acting under the authority delegated to it by the State had the power to enact the amendment to the Sanitary Code in controversy. The requirement of due process may be satisfied and still there may be an unlawful interference with interstate commerce. A State law may be good under due process, and bad as against interstate commerce (*Leisy* v. *Hardin,* 135 U. S. 100). Moreover, "it appears now that there is a difference as to presumption of validity, at least where economic interests are involved, namely, that it runs against validity in commerce law cases but in favor of validity in due process cases." (Dowling on Interstate Commerce and State Power, 27 Va. L. Rev. 121, Note 33, citing *McCarroll* v. *Dixie Lines,* 309 U. S. 176.)

The purpose of the amendment in question is not to prohibit the sale of horseflesh for animal or for human consumption. It is specifically conceded that horseflesh is just as nutritive and as healthful as beef. True, the thought of eating horseflesh is revolting to many; it is also cheaper than beef, and hence the State and municipality have an interest in preventing

confusion of the two products. "Decharacterization" of horseflesh was required not to protect the public health, but to prevent the deception of the public. As the Health Commissioner himself points out, the purpose of the law is "that horseflesh cannot be sold to the consumer without his knowledge." "Horse flesh", he says, "is one kind of food that the city is not going to permit to be foisted upon an innocent and unsuspecting public. To prevent this fraud and deceit, the law requires decharacterization."

The plaintiff's products are transported in interstate commerce and their sale in New York is an incident of interstate commerce. (*Savage* v. *Jones,* 225 U. S. 501, 520.) More than this, every operation of plaintiff's packing plant, in another State, is under the constant direction and control of the officials and inspectors of the Bureau of Animal Industry, a branch of the United States Department of Agriculture. The plaintiff's products are labelled "horse meat" and, except when ground with bone, are stamped by the Federal agency as fit for human consumption. All live horses are inspected before slaughter; the meat is again inspected after slaughter; and all carcasses and parts of carcasses are similarly inspected, and only those which are passed by the officials and stamped in accordance with the United States laws and regulations issued thereunder are packed and transported and sold.

The Meat Inspection Act of 1906 regulates the use in interstate commerce of any meat and meat food products (34 U. S. Stat. 669, 674). By Act of Congress approved July 24, 1919, this Meat Inspection Act was amended by what is known as the Horse Meat Act (U. S. Code, tit. 21, § 95) to include, within the scope of its provisions and the regulations promulgated thereunder, horse meat and horse meat products. Pursuant thereto the most detailed regulations were promulgated by the United States Department of Agriculture. By these enactments the Federal Government has set up a complete and comprehensive scheme governing the processing, labelling, transportation and sale of horse meat insofar as it is an article of interstate commerce.

Congress having acted in this field, the question is, what power, if any, is left to the various States and municipalities? What a State may do in a field of commerce, which is national in its character, in the absence of Congressional action, in the face of Congressional action or by express Congressional permission, has been the subject of much litigation. No attempt

will be here made to harmonize or even to summarize the decisions of the United States Supreme Court on this subject.*

Mr. Justice STONE in *S. C. Hwy. Dept.* v. *Barnwell Bros.* (303 U. S. 177, 185) said that " it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce but which, because of their local character and their number and diversity, may never be fully dealt with by Congress. Notwithstanding the commerce clause, such regulation in the absence of Congressional action has for the most part been left to the states by the decisions of this Court, subject to the other applicable constitutional restraints." (See, also, *Graves* v. *N. Y. ex rel. O'Keefe*, 306 U. S. 466, 479, note 1; *United States* v. *Darby*, 312 U. S. 100, 119, and cases cited.)

Here the field of commerce has been determined to be national in character; Congress has legislated with respect to it with the utmost particularity and has not seen fit, by express legislation, to remove the impediment to State control as it did for the sale of liquor, or convict-made goods. (*Leisy* v. *Hardin*, 135 U. S. 100, 109, *supra*; *Clark Distilling Co.* v. *West'n Md. Ry. Co.*, 242 U. S. 311; *Whitfield* v. *Ohio*, 297 U. S. 431.) Perhaps the leading Federal case applicable here is *Collins* v. *New Hampshire* (171 U. S. 30), where the Supreme Court of the United States held that a statute of New Hampshire, prohibiting the sale of oleomargarine, as a substitute for butter, unless it were of a pink color, was invalid as an unlawful interference with the freedom of interstate commerce.

Even in a field of commerce, national in character, which Congress has affirmatively entered by legislation, the State is not entirely excluded from action. The tendency of the cases has been to recognize that both the State law and the Federal law may prevail provided they are not inconsistent; if they are in conflict the Federal law has precedence. Just how far a State may go is not clearly defined by the cases. All that can be said is that there seems to be a trend to take a more realistic view of the doctrine of " Congressional pre-emption ", and to consider the balancing of national and of State interests in the field. Has a State under its reserved police power really

---

* The effect of the commerce clause on the power of the States to regulate interstate commerce is the subject of a learned article by Professor Noel T. Dowling, of the Columbia Law School, in which he seeks to find an underlying philosophy in the decisions of the Supreme Court of the United States in this field. In that article there is to be found a painstaking analysis of the important cases on the subject (Interstate Commerce and State Power, 27 Va. L. Rev. 1).

attempted to encroach upon the national prerogative? Has Congress spoken in such a way as to "silence State action" on the subject? Discrimination against commerce will of course not be tolerated, but it has frequently been held that a State has a certain residual power fairly to regulate products of interstate commerce where such regulation is reasonably required by considerations of public health and safety or to prevent fraud and deception. (See, for example, *Smith* v. *St. Louis and Southwestern Ry. Co.*, 181 U. S. 248; *Rasmussen* v. *Idaho*, 181 U. S. 198; *Patapsco Guano Co.* v. *North Carolina*, 171 U. S. 345, 357, and the cases cited in *S. C. Hwy. Dept.* v. *Barnwell Bros.*, 303 U. S. 177, 185, 191, *supra; California* v. *Thompson*, 313 U. S. 109, 114; *Savage* v. *Jones*, 225 U. S. 501, *supra.*)

The extent and the particularity of Federal legislation on the subject has a most important bearing on the scope of the State's power to act. Congress may leave part of the subject open to State action. Congress by its legislation may occupy only a limited field, in which event the State under its reserved police power may be free to act as to the remainder in a manner that will not conflict with the Federal legislation on the subject. As has heretofore been indicated, Congress has initiated the most detailed legislation with respect to horse meat and a Federal agency, pursuant to Congressional authorization, has adopted a closely knit body of regulations, not only in the interests of the public health but to prevent fraud and deception. The scope of the State's action relating to the same subject matter is therefore greatly restricted. For example, the regulations of the United States Department of Agriculture, which have the force of law, provide that no coloring matter may be injected except such as the Department considers harmless and these "only with the approval of and in such manner as may be designated by the department." (Regulation 18 Governing the Meat Inspection of the U. S. Dept. of Agriculture, eff. Nov. 1, 1922, Bureau of Animal Industry Order No. 211, Rev., § 6, par. 3.)

Unquestionably, the purpose behind the amendment is a good one. The record shows the existence of a real evil to be guarded against. There have been a number of instances where horseflesh has been fraudently sold as beef. This is an offense, and those detected have been punished, but such detection is fraught with many difficulties. There is no doubt as to the power of the State or the municipality to adopt reasonable measures designed to prevent the perpetration of a fraud

on the consuming public in connection with the sale of food products, even if no question of public health is involved. (Cf. *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, *supra,* upholding the constitutionality of sections 435 and 435-a of the Penal Law dealing with false labels and misrepresentations in the sale of food products and the sale of kosher meat and meat preparations.)

Clearly, despite Congressional action in this national field, the city would have the right to inspect horseflesh brought here from other States, and to require a permit for the sale of horseflesh; it could require the most detailed records to be kept by wholesalers and dealers in horse meat here; it could prohibit the sale of horseflesh in any establishment where other meat products intended for human consumption are kept or offered for sale; it could require labels and signs to prevent the likelihood of deception or of confusion. These requirements are all embodied in section 327 of the Sanitary Code, and their constitutionality is not challenged in this action. Perhaps even more stringent requirements may be imposed along these lines and wholesalers held to stricter accountability for the improper and fraudulent diversion of their product by those to whom they sold it.

But there is a distinct limit to the proper sphere of State action in this field. The challenged amendment to the Sanitary Code constitutes a direct impediment to the use of horseflesh in a manner specifically authorized by Federal law. The Sanitary Code amendment makes a person selling horseflesh guilty for doing something which Congress has specifically permitted him to do. The requirements of the amendment materially obstruct the exercise of rights conferred by the Federal legislation.

For example, the requirement artificially to color the horseflesh is in direct conflict with the Federal regulations that horseflesh shall not be artificially colored except with the approval of the Federal agency. If it is sought to require a certain amount of bone to be ground with the horseflesh that would be in direct conflict with specific authorization of a Federal agency to sell the horseflesh, passed and approved by it, without any bone content. Indeed to require a certain percentage of ground bone content would make the horseflesh unfit and even dangerous for human consumption.

The views here expressed find support in the most recent decision on this general subject handed down by the Supreme Court of the United States on June 11, 1945, in *Hill* v. *State of*

*Florida* (325 U. S. 538). There the court held that certain provisions requiring business agents of labor unions to be licensed and requiring every local labor union to file a report with the Secretary of State were invalid as an intrusion upon the Federal policy and scheme concerning labor unions set forth in the Wagner Act. (National Labor Relations Act, § 1 *et seq.;* U. S. Code, tit. 29, § 151 *et seq.*) The court in the prevailing opinion said: '' Our holding is that the National Labor Relations Act and Sections 4 and 6 of the Florida Act as here applied cannot ' move freely within the orbit of their respective purposes without infringing upon one another.' *Union Brokerage Co.* v. *Jensen,* 322 U. S. 203, 207.''

So it may be said with equal force in the case at bar that for a State or municipality to require the decharacterization of horse meat which has previously been approved as fit for human consumption pursuant to Federal legislation '' stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'' (*Hines* v. *Davidowitz,* 312 U. S. 52, 67; *Cloverleaf Co.* v. *Patterson,* 315 U. S. 148; *Napier* v. *Atlantic Coast Line,* 272 U. S. 605.)

The requirement for decharacterization is not only invalid under the prevailing view in *Hill* v. *State of Florida* (*supra*) but it is in conflict with the tests laid down in the dissenting opinion in that case.

A municipality may not therefore in regulating the sale of goods in interstate commerce, so as to prevent fraud and deception, require a change in the natural physical character of an unadulterated product declared to be a healthful, legitimate article of food moving in interstate commerce by a Federal agency acting pursuant to Congressional authorization. If there is to be a valid requirement for decharacterization of horseflesh moving in interstate commerce it must be as the result of co-operative and not conflicting State and Federal action on the subject.

Judgment is accordingly directed in favor of the plaintiff for the relief demanded in the complaint. Settle judgment in accordance with the foregoing determination.