MUTUAL FILM CO. v. INDUSTRIAL COMMISSION OF OHIO et al.

MUTUAL FILM CORPORATION v. SAME.

(District Court, N. D. Ohio, E. D.   April 2, 1914.)

Nos. 205, 206.

1. COURTS (§ 281*)—JURISDICTION OF FEDERAL COURT—FEDERAL QUESTIONS.
    The fact that federal questions are raised by a bill is sufficient to give
    a federal court jurisdiction, although such questions are decided adversely
    to complainant or the court finding it unnecessary to pass upon them
    decides the case on state questions alone.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820–825;  Dec.
    Dig. § 281.*]

2. THEATERS AND SHOWS (§ 2*)—REGULATION OF MOVING PICTURE EXHIBI-
    TIONS—POWER OF STATE.
    It is within the police powers of a state to establish a censorship of
    moving picture films exhibited in the state, and, if the measure enacted
    has reasonable relation to the regulation of such exhibitions, neither the
    federal nor state courts have power to adjudge it invalid.
    [Ed. Note.—For other cases, see Theaters and Shows, Cent. Dig. § 2;
    Dec. Dig. § 2.*]

3. STATUTES (§ 58*)—CONSTITUTIONALITY—REVIEW BY COURTS.
    The courts are without power to adjudge a state statute unconstitu-
    tional where the question of its constitutionality is at all doubtful.
    [Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 51, 53, 54, 196;
    Dec. Dig. § 58.*]

4. THEATERS AND SHOWS (§ 2*)—STATE REGULATION—CENSORSHIP OF MOVING
    PICTURE FILMS.
    Act Ohio May 3, 1913 (103 Ohio Laws, pp. 399–401), which provides for
    a board of censors of moving picture films to which all films must be sub-
    mitted before being publicly exhibited in the state, and prohibiting the ex-
    hibition of any film not bearing the stamp of approval of such board, is
    not in violation of the provisions of either the federal or state Constitu-
    tion safeguarding the freedom of the press, but is in effect a license reg-
    ulation and within the police power of the state.
    [Ed. Note.—For other cases, see Theaters and Shows, Cent. Dig. § 2;
    Dec. Dig. § 2.*]

5. THEATERS AND SHOWS (§ 2*)—STATE REGULATION—CENSORSHIP OF MOVING
    PICTURE FILMS.
    Such act relates only to films after they have been removed from the
    cases in which they are shipped and placed on reels to be publicly ex-
    hibited and displayed in the state, and as applied to films shipped from
    outside of the state is not in violation of the commerce clause of the Con-
    stitution, nor is it invalid as an inspection law under article 1, § 10, of
    the federal Constitution, because a fee of $1 for each reel of film ex-
    amined, not exceeding a certain length, is required, to be paid into the
    treasury of the state, nor as a delegation of legislative power because
    discretion is vested in the board to approve generally such films as are
    in their judgment of a "moral, educational or amusing and harmless char-
    acter."
    [Ed. Note.—For other cases, see Theaters and Shows, Cent. Dig. § 2;
    Dec. Dig. § 2.*]

In Equity.  Suits by the Mutual Film Company and by the Mutual
Film Corporation against the Industrial Commission of Ohio and Wal-
lace D. Yaple, Matthew B. Hammond, and Thomas J. Duffy, as mem-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bers of such commission, and the Board of Censors of Moving Picture Films of the State of Ohio, and J. W. Maddox, H. E. Vestal, and Maude Murray Miller, as members of such board.  On motion for preliminary injunction.  Denied.

Squire, Sanders & Dempsey, of Cleveland, Ohio, Wm. B. Sanders and Harold T. Clark, both of Cleveland, Ohio, and Walter N. Seligsberg, of New York City, for complainants.

Timothy S. Hogan, Atty. Gen., and James S. Bolger, Asst. Atty. Gen., both of Columbus, Ohio, and Robert M. Morgan, of Cleveland, Ohio, for defendants.

Before WARRINGTON, Circuit Judge, and KILLITS and DAY, District Judges.

PER CURIAM.  The ultimate question in these cases is whether a state has power to regulate the public exhibition of motion pictures. The statement of the question would seem to present a simple problem, and yet it is earnestly contended that the General Assembly of Ohio has through its enactment violated grave constitutional guaranties.  The contention is not that persons displaying improper pictures may not be punished after the fact; but it is that the display itself cannot be prevented.  This is not a denial of the existence of evil practices growing out of this class of public exhibitions; it is a challenge of the power of the state to avoid such practices through the exercise of any measures of prevention.  The issue then is one of remedy, and its nature is seen in the difference between the avoidance and the practical endurance of such evils as may exist.

The complainant in each case is a corporation, one having been organized under the laws of Ohio and the other under the laws of Virginia, and each is engaged in business as a distributor of moving picture films.  The defendants in each case are the same; the Industrial Commission of Ohio, and the board of censors of motion picture films, with their respective members.  The former board was created under an act approved March 18, 1913 (103 Ohio Laws, 95–110), and the latter under an act entitled "An act providing a board to censor motion picture films and prescribing the duties and powers of the same," approved May 3, 1913 (103 Ohio Laws, 399–401).  The first act is not directly involved, except a single section to which we shall later have occasion to allude; and the body of the second act is hereinafter set out.  The complainants seek to enjoin the enforcement of the second act, and this accounts for the presence of three judges (Judicial Code, § 266; Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 236]).  The bills are in the usual form and substantially alike. They will be sufficiently understood by setting out the substance of their pertinent averments, in connection with our consideration of the objections urged against the validity of the second act.

[1] No question of jurisdiction is presented.  Diversity of citizenship in the first case, and the presence of federal questions in both cases, are admitted; and the latter are sufficient to vest the court with jurisdiction, even though it should decide the federal questions adversely to the complainants, or, finding it unnecessary to pass upon such

questions, should decide the cases on state questions alone. Siler v. Louisville & Nashville R. Co., 213 U. S. 175, 191, 29 Sup. Ct. 451, 53 L. Ed. 753; Mich. Cent. R. R. v. Vreeland, 227 U. S. 59, 63, 64, 33 Sup. Ct. 192, 57 L. Ed. 417; Louisville & Nashville R. R. v. Siler (C. C.) 186 Fed. 176, 179; Ohio River & W. Ry. Co. v. Dittey (D. C.) 203 Fed. 537, 589.

[2] The second act, called by counsel the censorship law, has not been passed upon by the Supreme Court of Ohio, nor, so far as we know, by any court of the state. The main strength of the argument in support of the suits is aimed against the constitutional validity of the act; it appears in the margin.[1]

---

[1] "Section 1. There is created under the authority and supervision of the industrial commission of Ohio a board of censors of motion picture films. * * *

"Sec. 2. * * * Each member of the board of censors shall receive an annual salary of one thousand five hundred dollars per year. Such salary and expenses shall in no case exceed the fees paid to the Ohio board of censors for examination and approval of motion picture films. The members of the board shall be considered as employés of the industrial commission and shall be paid as other employés of such commission are paid. The industrial commission shall appoint such other assistants as may be necessary to carry on the work of the board.

"Sec. 3. It shall be the duty of the board of censors to examine and censor as herein provided, all motion picture films to be publicly exhibited and displayed in the state of Ohio. Such films shall be submitted to the board before they shall be delivered to the exhibitor for exhibition. The board shall charge a fee of one ($1.00) dollar for each reel of film to be censored which does not exceed one thousand (1,000) lineal feet; for any reel of film exceeding one thousand (1,000) lineal feet, the sum of two ($2.00) dollars shall be charged. All moneys so received shall be paid each week into the state treasury to the credit of the general revenue fund.

"Sec. 4. Only such films as are in the judgment and discretion of the board of censors of a moral, educational or amusing and harmless character shall be passed and approved by such board. They shall be stamped or designated in an appropriate manner and consecutively numbered. Before any motion picture film shall be publicly exhibited, there shall be projected upon the screen the words 'Approved by the Ohio Board of Censors,' and the number of the film.

"Sec. 5. The board of censors may work in conjunction with any censor board or boards of legal status of other states as a censor congress and the action of such congress in approving or rejecting films shall be considered as the action of the board and all films passed, approved, stamped and numbered by such congress, when the fees therefor have been paid to the Ohio board, shall be considered approved by such board.

"Sec. 6. Ninety days after this act shall take effect no films may be publicly shown or exhibited within the state of Ohio unless they have been passed and approved by the board or the censor congress and stamped and numbered by such board, or congress, as provided for herein.

"Sec. 7. Any person, firm or corporation who shall publicly exhibit or show any motion picture within the state of Ohio unless it shall have been passed, approved and stamped by the Ohio board of censors or the congress of censors shall upon conviction thereof, be fined not less than twenty-five ($25.00) dollars nor more than three hundred ($300.00) dollars, or imprisoned not less than thirty days nor more than one year, or both, for each offense.

"Sec. 8. Any person in interest being dissatisfied with any order of such board shall have the same rights and remedies as to filing a petition for hearing on the reasonableness and lawfulness of any order of such board or to set aside, vacate or amend any order of such board, as is provided in the case of persons dissatisfied with the orders of the industrial commission."

Examination of the act plainly discloses an exercise of the state's police power; and no one doubts that this power extends to the making of regulations "promotive of domestic order, morals, health, and safety." Railroad Co. v. Husen, 95 U. S. 465, 471, 24 L. Ed. 527. Presumably the General Assembly was convinced that the business of exhibiting motion picture films was attended with such public evils as both to warrant and demand regulation; and, if the measures adopted have reasonable relation to that end, it is not open to the judiciary to interfere. It does not matter that the subject in the main is harmless; it does matter, however, if something is associated with it that is harmful; and it is only when it clearly appears that the enactment has no real or substantial relation to a proper subject, or is unquestionably an invasion of rights secured by the fundamental law, that the courts either of the United States or of the state of Ohio will interfere. Purity Extract Co. v. Lynch, 226 U. S. 192, 201, 202, 33 Sup. Ct. 44, 57 L. Ed. 184; Schmidinger v. City of Chicago, 226 U. S. 578, 587, 588, 33 Sup. Ct. 182, 57 L. Ed. 364; Jacobson v. Massachusetts, 197 U. S. 11, 31, 25 Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Otis v. Parker, 187 U. S. 606, 609, 23 Sup. Ct. 168, 47 L. Ed. 323; Noble State Bank v. Haskell, 219 U. S. 104, 111, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062; Booth v. Illinois, 184 U. S. 425, 429, 22 Sup. Ct. 425, 46 L. Ed. 623; Board of Health v. Greenville, 86 Ohio St. 1, 20, 23, 98 N. E. 1019, Ann. Cas. 1913D, 52.

[3] This is but recognizing the "principle, long established and vital in our constitutional system, that the courts may not strike down an act of legislation as unconstitutional, unless it be plainly and palpably so." Booth v. Illinois, supra, 184 U. S. at page 431, 22 Sup. Ct. at page 428 (46 L. Ed. 623). And, as Judge Donahue expressed the rule prevailing in Ohio:

"A court is not authorized to adjudge a statute unconstitutional where the question of its constitutionality is at all doubtful." Board of Health v. Greenville, supra, 86 Ohio St. at page 20, 98 N. E. at page 1021 (Ann. Cas. 1913D, 52).

Having these principles in mind, we shall consider as briefly as we may the objections urged against the constitutional validity of the statute.

[4] 1. In the argument at the bar it was insisted for complainants, and in the briefs it still is, that the statute violates the freedom of the press under the guaranty of the first amendment to the Constitution of the United States. Ordinarily it would be enough to say of this, as Mr. Justice Miller said in Eilenbecker v. Plymouth County, 134 U. S. 31, 34, 10 Sup. Ct. 424, 425 (33 L. Ed. 801):

"That the first eight articles of the amendments to the Constitution have reference to powers exercised by the government of the United States and not to those of the states."

And see Lloyd v. Dollison, 194 U. S. 445, 447, 24 Sup. Ct. 703, 48 L. Ed. 1062. Recognizing the controlling force of this rule, complainants associate the first amendment with the clause of the fourteenth amendment, providing:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

Then they seem to regard this as unimportant, and at last rely on section 11 of article 1 of the state Constitution, which provides: .

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * * "

It is claimed, as before pointed out, that this provision contemplates legislation providing for punishment after an act forbidden is committed, but that such an act cannot be prevented. Thus decisions which establish the right simply to punish—such, for instance, as People v. Most, 171 N. Y. 423, 64 N. E. 175, 58 L. R. A. 509, or Tyomies Pub. Co. v. U. S. of America, 211 Fed. 385, decided March 3, 1914 (C. C. A. 6th Cir.)—are not questioned. It is urged on behalf of the state that the question so presented is met by the rule that the corporate complainants are not citizens within the true meaning of the guaranties contained either in the clause of the fourteenth amendment or of the Ohio Constitution, before quoted. Blake v. McClung, 172 U. S. 239, 259, 19 Sup. Ct. 165, 43 L. Ed. 432; Western Turf Ass'n v. Greenberg, 204 U. S. 359, 363, 27 Sup. Ct. 384, 51 L. Ed. 520; Selover, Bates & Co. v. Walsh, 226 U. S. 112, 126, 33 Sup. Ct. 69, 57 L. Ed. 146; Orient Insurance Co. v. Daggs, 172 U. S. 557, 566, 19 Sup. Ct. 281, 43 L. Ed. 552. But since these decisions did not involve the Ohio guaranty, we prefer to consider the statute upon its merits.

It is averred in the bills:

"That the motion pictures, the films for which are purchased, sold and leased by complainant, depict dramatizations of standard novels and short stories and the performance of standard dramas. * * * That they also exhibit many subjects of scientific interest, such as showing the various uses that may be made of electricity, showing the manner of development and growth of various forms of animal and plant life, giving pictures of trips of exploration * * * and pictures of other subjects covering a range as wide as life itself, which are educational, instructive, and amusing. That one of the most important classes of subjects exhibited in complainant's motion picture films is the depicting of events * * * described in words and by photographs in newspapers, weekly periodicals, magazines, and other publications; * * * this regular furnishing and publishing of news through the medium of motion pictures being done under the name of the 'Mutual Weekly.' "

It is contended that the Mutual Weekly, so described, is as much a press enterprise as are any of the standard magazines, periodicals, and newspapers; and that, unless it can be safely affirmed that the state may provide for the censoring of newspapers and magazines, the present statute cannot be sustained. We cannot believe that this question is in reality involved. Counsel overlook a broad distinction between the things they describe in their bills and the objects with which they make comparison. Analysis of the bills and affidavits, not to speak of familiar knowledge, serves to show that an exhibition of these motion picture films, with its inclosure, surroundings, and attendance, has all the material attributes of an ordinary theater. The state of Ohio had prior to the enactment in question made detailed statutory provisions respecting the construction and maintenance of buildings in which mov-

ing picture films might be publicly exhibited, and had imposed penalties for violation of such provisions. 6 Page & Adams Ann. Gen. Code, pp. 121, 234. The business in which complainants are confessedly engaged would have no reason to exist if the picture films they supply were not employed as the means of furnishing entertainment and amusement at these exhibitions. These films are, so to speak, the actors, the stage players, to produce the drama (Kalem Co. v. Harper Bros., 222 U. S. 55, 61, 32 Sup. Ct. 20, 56 L. Ed. 92), or other entertainment. The object and the ordinary and natural tendencies of such enterprises are to attract people; and, of course, as the picture films increase in range and variety, so does the attendance. It is true the statute does not make direct provision as to either exhibitors or places; but indirectly it does this and more; it provides in effect for licensing the use of films, the only films the exhibitors can publicly display. Sections 4 and 7 of Act, supra. Why then is this not the practical equivalent of a plan to regulate these public exhibitions, the picture film theaters, through the old system of granting and, if necessary, revoking, or withholding, licenses? Since the state has in effect declared the existence of public evils growing out of these picture film exhibitions, which require regulation, what court can rightfully say, in cases like these, either that such evils do not exist, or that the measures adopted are not reasonably designed to correct the evils?

If this interpretation of the statute is at all admissible, it is a mistake to ascribe to the Legislature a purpose to do anything inimical to the principle of freedom of the press. It was seeking to accomplish a totally different object. It was apparently providing that the most salutary principles of a public license system should be applied to the use of this new instrumentality in places of amusement. It can make no difference what its use achieves or constitutes, whether it be a drama, a publication, or even more. It is the manner and the place of such use that must concern the lawmaker. It is to be remembered, too, that the guaranty here invoked, like other guaranteed rights and privileges, is to be reasonably restricted and so reconciled with the exercise of the fundamental powers and duties of the state in relation to the public at large. Counsel's argument assumes a degree of repugnancy between such privileges and powers which in logical effect would unnecessarily sacrifice the latter; for it denies to the state the right simply to protect the public against immoral and harmful acts. As Mr. Justice Field said, in Crowley v. Christensen, 137 U. S. 86, 89, 11 Sup. Ct. 13, 15 (34 L. Ed. 620):

"Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will."

And see Board of Health v. Greenville, supra, 86 Ohio St. at page 22, 98 N. E. at page 1022 (Ann. Cas. 1913D, 52). It was never supposed there was any repugnancy between the legislative power to regulate theaters and the guaranty of freedom of the press. Complainants' counsel place special reliance upon a decision, which, when read in connection with a later decision of the same court, presents a good illustration of this. We allude to Dailey v. Superior Court, 112 Cal. 94, 44 Pac. 458, 32 L. R. A. 273, 53 Am. St. Rep. 160, where it was

held by a divided court that a judicial order forbidding the representation, upon a theatrical stage, of the facts of a particular criminal case, then on trial, was an infringement of the state constitutional provision which protects the right of a citizen freely to speak, write, and publish his sentiments. But later the same court, in Greenberg v. Western Turf Ass'n, 148 Cal. 126, 82 Pac. 684, 113 Am. St. Rep. 216, when speaking of the right to license and regulate vocations and employments, and to prohibit exhibitions, shows, places of amusement, and the like (without as much as alluding to Dailey.v. Superior Court), held (148 Cal. 128, 82 Pac. 685 [113 Am. St. Rep. 216]):

"The state, in the exercise of its police power, has the unquestioned right to regulate these places of public amusement, and it is in the exercise of this power, and not at all as having to do with civil rights, that the act in question was upheld in 140 Cal. (and 73 Pac.), and its constitutionality is here again affirmed."

And in Laurelle v. Bush, 17 Cal. App. 409, 119 Pac. 953, an ordinance regulating moving pictures, and making it unlawful for any person to conduct or carry on a moving picture exhibition, without first applying for and receiving a permit, was sustained; and the appellate court, like the Supreme Court in the Greenberg Case, did not find it necessary even to cite the decision in Dailey v. Superior Court. The reason for this, no doubt, was that the judiciary does not, while the Legislature does, possess authority to regulate theaters; it is not meant by this either to signify approval or disapproval of the decision in Dailey v. Superior Court. Commonwealth v. McGann, 213 Mass. 213, 215, 100 N. E. 355; Patterson v. Colorado, 205 U. S. 454, 462, 27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689. We need not dwell upon the familiar power of a state to provide for the granting or withholding of licenses as a means of regulating theatrical performances; it is sufficient to say that any reasonable exaction or denial of such licenses is universally regarded as a proper exercise of the police power. Marmet v. State, 45 Ohio St. 63, 72, 73, 12 N. E. 463; Baker v. Cincinnati, 11 Ohio St. 534; Commonwealth v. McGann, supra, 213 Mass. 213, 216, 100 N. E. 355; People v. Steele, 231 Ill. 340, 344, 345; [1] Brackett, Theatrical Law, p. 37, § 32 et seq.; Cooley's Const. Lim. (7th Ed.) p. 884 et seq.; 2 Story, Const. Lim. (5th Ed.) § 1954; 2 Blackstone (Cooley's 3d Ed.) p. 167. This power to give or withhold licenses may be extended to public speaking in the highways or public grounds within municipalities. Davis v. Massachusetts, 167 U. S. 43, 47, 17 Sup. Ct. 731, 42 L. Ed. 71; Love v. Judge of Recorder's Court, 128 Mich. 545, 549, 87 N. W. 785, 55 L. R. A. 618; Fitte v. City of Atlanta, 121 Ga. 567, 568, 49 S. E. 793, 67 L. R. A. 803, 104 Am. St. Rep. 167. Besides, the rule of Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, and the class of decisions following it, prevails in Ohio as to purely local matters (Zanesville v. Gas Co., 47 Ohio St. 1, 30, 31, 23 N. E. 55); and, since complainants devote their films to a use in which the public is interested, they must for that reason submit to the control of the public so long as they continue such use (Atlantic Coast Line R. R. Co. v. City of Goldsboro, 232 U. S. 548, 34 Sup. Ct. 364, 58 L. Ed. 721, decided by the Supreme Court February 24, 1914).

[1] 83 N. E. 236, 14 L. R. A. (N. S.) 361, 121 Am. St. Rep. 321.

Furthermore, the right of a state to regulate the use of moving picture films has been repeatedly upheld in other jurisdictions, though we do not discover that the question of interference with the freedom of the press was presented in any of the cases. In State v. Loden, 117 Md. 373, 380, 381, 83 Atl. 564, 567 (40 L. R. A. [N. S.] 193, Ann. Cas. 1913E, 1300), an act providing for the regulation of moving picture machines in the city of Baltimore, and for the appointment by the Governor of a board to be known as the "Board of Examining Moving Picture Machine Operators," and vesting the board with power to issue, suspend, or withhold licenses, to exact fees for the issuance of licenses, and after paying the members of the board for their services and expenses requiring them to pay any surplus to the state treasurer, was passed upon, the court, besides denying certain objections presented against the validity of the law, held:

"The act was to protect the people of Baltimore City against the consequences resulting from the work of incompetent moving picture machine operators and was passed in the exercise of the police power of the state, and does not, in our opinion, violate either the federal or state Constitution."

In Block v. City of Chicago, 239 Ill. 251, 87 N. E. 1011, 130 Am. St. Rep. 219, an ordinance was upheld, which required those engaged in exhibiting moving pictures to secure a permit for the exhibition of such pictures, and forbade the chief of police to issue such a permit for the exhibition of any obscene or immoral pictures, though it required him to issue a permit without fee or charge respecting pictures not of that character. To the same effect are the decisions in Laurelle v. Bush, supra; Higgins v. Lacroix, 119 Minn. 145, 150, 151, 137 N. W. 417, 41 L. R. A. (N. S.) 737; Dreyfus v. City of Montgomery, 4 Ala. App. 270, 58 South. 730, 732. See, also, State v. Morris, 1 Boyce (Del.) 330, 76 Atl. 479; People v. Gaynor, 77 Misc. Rep. 576, 137 N. Y. Supp. 196, 199; McKenzie v. McClellan, 62 Misc. Rep. 342, 116 N. Y. Supp. 645, 646. It results that so far as the foregoing constitutional provisions, either federal or state, are concerned, the statute is sustainable as a license measure, and so, as to the claims thus far considered, is not an undue interference with any right of complainants.

[5] 2. It is claimed that the statute violates the commerce clause. Substantially all the films supplied by complainants are manufactured outside the state of Ohio. The films are brought into the state in shipping packages containing one or more tin boxes in each of which is a film wrapped on a core. When the packages reach their destination in the state, they are opened and the films taken off the shipping cores and put on reels, and then placed in the stock of an exchange. The reels are then distributed among the exhibitors and passed from one to another for purposes of public exhibition. Some of these films circulate wholly within Ohio until worn out, while some remain there only for brief periods. It is to the films so placed on reels that the statute applies. The statute in terms limits the duty of the board of censors to examination of "all motion picture films to be publicly exhibited and displayed in the state of Ohio." They must be submitted to the board before they are delivered to exhibitors for exhibition, and the fees charged are fixed by uniform rates according to the length of "each reel

215 F.—10

of film." Section 3 of Act, supra. We are therefore not concerned with shipping packages which pass into and out of the state in their original form. It cannot be said that the act imposes any sort of burden upon the original shipping packages; for, when the packages are broken and their contents placed upon reels, the films have lost their distinctive character as articles of interstate commerce. May v. New Orleans, 178 U. S. 496, 508, 20 Sup. Ct. 976, 44 L. Ed. 1165. It is said that the use made of the films is similar to that made of books belonging to circulating libraries; but we do not see how this feature can affect the question now under consideration. While the films are in use for public exhibition within a given state, they are like any other property owned and used in the state. It can make no difference that all are not consumed through use in a particular state, and that such as survive are shipped into one or more other states and there similarly used; for in each instance commerce ceases where local use commences. Above all, the films that are open to action of the board are subject to uniform treatment and charge, no matter in what state they originated or who may own or supply or use them in Ohio and whether such persons be resident therein or not. It is in vain then to urge that the statute violates the commerce clause. Hinson v. Lott, 8 Wall. 148, 153, 19 L. Ed. 387; Machine Co. v. Gage, 100 U. S. 676, 679, 25 L. Ed. 754; Emert v. Missouri, 156 U. S. 296, 314, 322, 15 Sup. Ct. 367, 39 L. Ed. 430; Patapsco Guano Co. v. North Carolina, 171 U. S. 345, 354, 359, 18 Sup. Ct. 862, 43 L. Ed. 191; Brown Forman Co. v. Kentucky, 217 U. S. 563, 575, 30 Sup. Ct. 578, 54 L. Ed. 883; Savage v. Jones, 225 U. S. 501, 525, 32 Sup. Ct. 715, 56 L. Ed. 1182.

3. It is said the statute is not sustainable as an inspection law under section 10, art. 1, of the federal Constitution. It is to be observed that this provision forbids a state, without the consent of Congress, to lay imposts or duties on imports or exports except as may be absolutely necessary for executing its inspection laws, and the net produce of such duties and imposts shall be for the use of the federal treasury. The objection is aimed against the fees authorized by the present statute and the requirement that they shall be paid into the state treasury. This does not seem to be important. In the first place, the word "imports," as used in the Constitution, does not apply to property brought from one state into another, but only to imports from foreign countries. Brown v. Houston, 114 U. S. 622, 628, 5 Sup. Ct. 1091, 29 L. Ed. 257; Woodruff v Parham, 8 Wall. 123, 136, 19 L. Ed. 382. In the next place, if films should be imported from foreign countries into Ohio, it could not now be presumed that the authorized fees would be more than are absolutely necessary for executing the law. And, as Mr. Chief Justice Fuller said in Patapsco Guano Co. v. North Carolina, supra, 171 U. S. at page 354, 18 Sup. Ct. at page 865 (43 L. Ed. 191):

"If the receipts are found to average largely more than enough to pay the expenses, the presumption would be that the Legislature would moderate the charge."

See, also, Red "C" Oil Co. v. North Carolina, 222 U. S. 380, 393, 32 Sup. Ct. 152, 56 L. Ed. 240.

It is only when such fees are proved to be in excess of the necessary expenses and their exaction is persisted in, that judicial interference will be warranted. Foote & Co., Inc., et al. v. Stanley, 232 U. S. 494, 34 Sup. Ct. 377, 58 L. Ed. 698, decided by the Supreme Court February 24, 1914. Moreover, this objection is based upon the assumption that the statute is an inspection law. Even if this were accepted as the true characterization of the statute, its enactment would remain an exercise of the police power and so would not change the result.

4. It is argued that the statute delegates legislative power to the board of censors in violation of section 1, art. 2, of the Ohio Constitution. The theory is that the statute fixes no definite standard for determining what films shall be approved or disapproved by the board; but that this is left to its judgment and discretion and so in its essence is legislative. The language of section 4, supra, is:

"Only such films as are in the judgment and discretion of the board of censors of a moral, educational or amusing and harmless character shall be passed and approved by such board."

It may be conceded that this language might have been extended by descriptive and illustrative words, and yet it is not at all certain that the act would have been any more intelligible than it is now. It would probably have been more restrictive, and its purposes more easily thwarted. In view of the range of subjects which complainants claim to have already compassed, not to speak of the natural development that will ensue, it would be next to impossible to devise language that would be at once comprehensive and automatic. Is it correct, then, to say that the enacted standard is insufficient? It seems to us to find analogy in many subjects of approved legislation. Thus, boards of health have been accustomed to prosecute inquiries into and to determine the facts of the existence or not of nuisances and other local conditions injurious to health. Boards and officers are frequently employed to inspect and pass upon private buildings with a view of having changes made as respects sanitary objects, fire prevention, and the like. These are but some of the illustrations that are adducible to show not only the necessity but the practice of lodging discretion in subordinate agencies in the interest and for the protection of the public. Government administration and regulation could not be adequately carried on, or even rationally exist, if everything of a subordinate and yet injurious character had to be passed upon by the legislative bodies themselves. Inevitably, then, some discretion must be lodged somewhere; and where could it be more appropriately placed than in the administrative boards created and selected for the execution of such laws? It was said by Chief Justice Cartwright, in Block v. City of Chicago, supra, 239 Ill. at page 258, 263, 87 N. E. at page 1013, 1015 (130 Am. St. Rep. 219), when considering an ordinance which prohibited the exhibition of "immoral or obscene" moving pictures:

"The purpose of the ordinance is to secure decency and morality in the moving picture business, and that purpose falls within the police power. It is designed as a precautionary measure to prevent exhibitions criminal in their nature and forbidden by the laws. * * * The audiences include those classes whose age, education, and situation in life specially entitle them to protection against the evil influence of obscene and immoral representations."

Again, when passing upon an objection that the ordinance fixed no standard, it was said:

"Manifestly it would be impossible to specify in an ordinance every picture or particular variety of picture which would be considered immoral or obscene, and no definition could be formulated which would afford a better standard than the words of the ordinance."

We think the present question is in principle resolved unfavorably to complainants by the decision in Board of Health v. Greenville, supra. There the State Board of Health was authorized to determine whether the contamination of any stream amounted to a "public nuisance detrimental to public health or comfort"; and upon the board's affirmative finding, after approval by the Governor and Attorney General, a municipality or person could be required to install works "satisfactory to the State Board of Health for purifying" any such stream. See, also, Fairview v. Giffee, 73 Ohio St. 183, 189, 190, 76 N. E. 865; Rose v. Baxter, 7 Ohio N. P. (N. S.) 132, affirmed without report, 81. Ohio St. 522, 91 N. E. 1138; Theobald v. State, 30 Ohio Cir. Ct. R. 336, 338, 339. In this latter case the court upheld the law as amended, which, in its original form, had been condemned by the Supreme Court in Harmon v. State, 66 Ohio St. 249, 64 N. E. 117, 58 L. R. A. 618. We think the standard fixed by the statute now under consideration will bear favorable comparison with that prescribed by the amended act passed upon in the Theobald Case, and that the instant cases are distinguishable from Harmon v. State for that reason. We are thus constrained to believe that, under the present rule of decision of Ohio alone, the primary standard here prescribed is sufficient to avoid the charge that legislative power is delegated. C. W. & Z. Railroad Co. v. Commissioners of Clinton County, 1 Ohio St. 77, 88, 89, per Ranney, J. And our views as to the sufficiency of the primary standard are strengthened by decisions of the Supreme Court of the United States. Red "C" Oil Co. v. North Carolina, supra, 222 U. S. 394, 32 Sup. Ct. 152, 56 L. Ed. 240; Monongahela Bridge v. United States, 216 U. S. 177, 192, 193, 30 Sup. Ct. 356, 54 L. Ed. 435; Int. Com. Comm. v. Goodrich Transit Co., 224 U. S. 194, 214, 32 Sup. Ct. 436, 56 L. Ed. 729; Jacobson v. Massachusetts, 197 U. S. 11, 27, 25 Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Union Bridge Co. v. United States, 204 U. S. 364, 382, 27 Sup. Ct. 367, 51 L. Ed. 523.

As to the suggestion that the board of censors is invested with arbitrary power, it is sufficient to say that under section 8 of the act, supra, provision is made for reviewing any order of the board in the Supreme Court of the state. This remedy was given by creating in any dissatisfied person in interest the same right of review that is given in respect of orders of the Industrial Commission. Section 38 of the act creating that body authorizes an action to be commenced in the Supreme Court of the state to set aside, vacate, or amend an order that is either unreasonable or unlawful; and the Supreme Court is invested with "such revisory jurisdiction of the proceedings of administrative officers as may be conferred by law." Article 4, § 2, Ohio Const.

While we have considered all the objections made to the statute, it is not necessary to prolong the discussion. We are unable to find anything in the act that is opposed to either the state or federal Constitution. It follows that the application for an interlocutory injunction in each case must be denied. However, in order to enable complainants to take an appeal in each of the suits directly to the Supreme Court of the United States, pursuant to section 266 of the Judicial Code, and to apply to that court for orders of suspension or supersedeas, if they so desire, we have concluded to suspend the operation of the orders of denial herein for a period of 15 days from the date of their entry.