# PORTO RICO AMERICAN TOBACCO COMPANY
## v.
# JOSE E. BENEDICTO, TREASURER OF PORTO RICO.

San Juan, Equity, No. 1008.

LOCAL TOBACCO INSPECTION LAW.

Jurisdiction—Constitutionality of Local Act.

     1. Porto Rico is not a state and no analogy can be drawn from state constitutions to the Organic Act for the Island.

---

NOTE.—On validity of state inspection laws as applied to commodities in interstate commerce, see note in L.R.A.1916D, 196.

Porto Rico American Tobacco Co. v. Benedicto.

Same—Bill of Rights.

2. The Bill of Rights prefixed to the Organic Act of Porto Rico is the Constitution of the United States so far as Congress has seen proper to extend it to Porto Rico as a territory not incorporated into the Union. The Federal court in Porto Rico can pass upon all acts depending upon constitutional provisions. The provision in the Organic Act that the title shall embrace only one subject is an act of Congress, and its violation vel non can be decided by the Federal court.

Revenue Law—Inspection Law.

3. The presumption is that legislation is constitutional. Porto Rico as a government has the right to pass inspection laws, for this is a part of the police law.

Same—One Act.

4. The same act cannot be both for revenue and inspection. The prohibition of more than one subject in an act is to prevent surprise upon the legislature, but it was not intended to prohibit the uniting of provisions having one general object fairly indicated by the title.

Inspection—Revenue Provisions.

5. Laws as to inspection may contain provisions as to necessary fees, but these cannot be so extended as to form a definite source of revenue by an unreasonable charge of the cost of administration.

Inspection—Time to Test Provisions.

6. A legislature is presumed to intend the natural result of its acts. The fact that a statute was enacted in good faith cannot prevent the courts from inquiring into the natural effect of its operation. It is not necessary for this court to presume that the act was enacted in bad faith. It is a question not of names, but of results.

Inspection Law—Size of Packages.

7. The legislature can prescribe the size of packages, but not so as to conflict with the existing customs of legitimate trade.

Due Process of Law—Organic Act.

8. Porto Rico cannot enact laws depriving any person of life, liberty, or property without due process of law, and this clause must be construed the same as in the Constitution from which it was taken.

Porto Rico American Tobacco Co. v. Benedicto.

Interstate Commerce—Porto Rico Cannot Tax

  9. The local legislation in Porto Rico cannot tax interstate commerce under the guise of an inspection law. Such a law can be attacked by any American citizen.

Interstate Commerce—When Begins.

  10. Interstate commerce begins when packages are segregated from the general property of the community and destined for interstate shipment.

Opinion filed August 26, 1918.

## Statement of Facts.

The bill in this case was filed April 6, 1918, by the plaintiff against the defendant, who is the treasurer of the Island of Porto Rico. The bill has been already discussed in some respects upon the motion to dismiss for want of jurisdiction. There was an amendment made that the part of the act requiring stamps for local consumption, and not for export, violates the Organic Act because not within the title, and that the act imposes a tax on exports. The affidavits now submitted in aid of and against the application for preliminary injunction do not show a great difference as to the facts.

The law attacked by the bill is Act. No. 50, entitled: "To Amend an Act Entitled 'An Act to Protect Porto Rican Cigars from Fraudulent Misrepresentation, by Providing for Adequate Expert Inspection, and the Issue of Stamps of Guaranty Covering the Origin of Tobacco Used in the Manufacture of Such Cigars, Intended for Exportation, and for Other Purposes,' Approved March 11, 1915." Second Laws of Porto Rico 1917, p. 358.

This act amends §§ 1, 2, 3, and 6 of another act with identi-

cally the same caption approved March 11, 1915, being Act
No. 31 in Laws of Porto Rico 1915, p. 60, Sections 4, 5, 7–11 of
the original act are not disturbed, prescribing the form of the
guaranty stamps, where they shall be affixed, applications and
oaths, counterfeiting and regulations, and, in § 9, appropriating
$12,000 for salaries, transportation, and per diem expenses of
employees, furniture, and stationery.    Sections 10 and 11
refer to repeal of conflicting laws and the like.

The original Act of 1915 referred to exportation, and made
it necessary to affix the stamps to leaf tobacco as well as to
cigars.    Section 3 provided: "No charge shall be made for
guaranty stamps to be furnished to cigar manufacturers under
the provisions of this act," which is entirely rewritten in the
amended Act of 1917 so as to read as follows: "The denomina-
tion of each guaranty stamp for original boxes or packages con-
taining cigars for export or consumption in Porto Rico shall
be one cent each, and twenty-five cents each for packages con-
taining leaf tobacco, scraps or stripped tobacco for export." Sec-
tion 6 refers to tobacco register book to be kept by manufacturers
open to inspection of revenue agents, the original act being
limited to cigars, and the amended act inserting also leaf to-
bacco.

The case was submitted on the application for preliminary
injunction on May 20, 1918.


Messrs. *Luis Muñoz Morales* and *J. Henri Brown* for plain-
tiff.


Mr. *Howard L. Kern,* Attorney General and Mr. *Ferdinand
Tannenbaum,* Assistant Attorney General, for defendant.

Porto Rico American Tobacco Co. v. Benedicto.

HAMILTON, Judge, delivered the following opinion:

The court has already determined upon preliminary proceedings that it has jurisdiction over the defendant, and so, while that question is raised upon the merits and in the briefs, it will not be further discussed. Jurisdiction is affirmed both as to the defendant, treasurer of Porto Rico, and on the ground that the plaintiff has no adequate remedy at law. The merits of the application for preliminary injunction will now be taken up.

1. Perhaps there should be first discussed the claim of the defendant that this court has no jurisdiction to determine the constitutionality of a law of the local legislature. It has been said that it is difficult to cite a case where a Federal court will test the validity of state legislation in the light of the state Constitution. Jackson v. Cravens, 235 Fed. 212. Mr. Justice Holmes observed that all cases in the District of Columbia—and the same is true of any territory—arise under acts of Congress, and probably it would require little ingenuity to raise the question of construction in almost any one of them. In such case the appellate jurisdiction of the Supreme Court has been largely and irrationally increased. American Secur. & T. Co. v. District of Columbia, 224 U. S. 491, 495, 56 L. ed. 856, 857, 32 Sup. Ct. Rep. 553. The Supreme Court held that a case arising under a territorial act is not one as to the validity of an authority exercised under the United States (Snow v. United States, 118 U. S. 346, 352, 30 L. ed. 207, 209, 6 Sup. Ct. Rep. 1059), being a certiorari under a criminal statute of the territory of Utah. If conflict with the state Constitution is the sole ground of attack, the supreme court of the state

is the final authority.   Michigan C. R. Co. v. Powers, 201 U.
S. 245, 291, 50 L. ed. 744, 760, 26 Sup. Ct. Rep. 459.   The
Federal courts should not act in matters affecting the revenue
laws of the state, therefore of general public interest, until the
local courts have passed upon the question.   Michigan C. R. Co.
v. Powers, supra, p. 291.

This brings up the nature of the government established in
Porto Rico.   In the first place, it is not a state in any sense of
the word; but on the other hand, it is territory, not incorporated
into the Union, it is true, but vested, perhaps the more so on
that account, with extensive powers, and geographically lying
so far away from the mainland, and its people of such different
origin and customs, that special provisions have been required
and allowed such as probably have not been granted in the case
of any other territory.   This makes all questions as to the rela-
tion of Porto Rico to the United States of extreme delicacy.
Nevertheless when they arise they must be met.

Whatever be the exact relation of Porto Rico to the Union,
at least it is not a state, and no analogy can be drawn from state
constitutions to the Organic Act of this Island.   While from
below that is in the nature of a constitution, as being the funda-
mental law, looked at from above, it is only an act of Congress,
to be treated and decided on the same principles as other acts
of Congress.

2. On the other hand it is not at all analogous to acts passed
by Congress for the District of Columbia, for which Congress
sits as a local legislature.   It may be there are some clauses in
the Jones Act which are of a similar nature, but at least the
provisions now in controversy are not of that character.   One
of these is in the Bill of Rights prefixed to this Organic Act,

and the Bill of Rights is the Constitution of the United States so far as Congress has seen proper to extend it to this particular territory, as yet unincorporated into the Union. The very first clause of the Bill of Rights, § 2 of the Jones Act is "that no law shall be enacted in Porto Rico which shall deprive any person of life, liberty or property without due process of law, or deny to any person therein the equal protection of the laws" [39 Stat. at L. 951, chap. 145, Comp. Stat. —, § 3803aa.] that is to say, what is known as the due process clause of the Constitution, contained in Amendments 5 and 14. If this provision cannot be considered by the court, then the Federal court is without jurisdiction in constitutional matters arising in Porto Rico. The result would be that constitutional questions affecting American citizens cannot, in this territory of the United States, be passed on by the United States court. Varying somewhat the expression of Mr. Justice Holmes, the jurisdiction of this court would in such case be greatly and irrationally diminished, and we do not believe Congress meant such a result. American Secur. & T. Co. v. District of Columbia, 224 U. S. 495, 56 L. ed. 857, 32 Sup. Ct. Rep. 553. It is not to be presumed that Congress would confine constitutional questions to local courts when it had expressly created a Federal court for the Island.

It is perhaps not so clear as to the other section (§ 34) of the Jones Act which is invoked in this case, to the effect that "no bill, except general appropriation bills, shall be passed containing more than one subject which shall be clearly expressed in its title." This is not a provision found in the Constitution of the United States, and if Porto Rico were a state it would be one found in the local constitution only. The same reason-

ing as to the relation of this court to constitutional questions does not arise; but the Jones Act is not a local constitution. It is an act of Congress, and there would be no more reason for considering that Congress designed a local court created by the act to be the sole judge of the provisions of this Organic Act than to suppose that Congress intended the Federal court created by the same act to pass upon such questions. The basis for this is different from that in regard to what is taken bodily from the Federal Constitution, but as a matter of construction the conclusion seems to be equally clear.

If the validity of an authority exercised under the United States in the passage and enforcement even of a local law is directly challenged, the case involves the validity of an authority exercised under the power derived from the United States, and is not merely a construction of a legislative act of a territory such as was passed on in the Snow Case, supra. The power to pass the act at all, in view of the requirements of the Constitution of the United States, is the subject-matter in controversy, and is, therefore, a constitutional question. New Mexico ex rel. McLean v. Denver & R. G. R. Co. 203 U. S. 48, 51 L. ed. 85, 27 Sup. Ct. Rep. 1.

3. The title of this act is, To Protect Porto Rican Cigars from Fraudulent Misrepresentation by Providing for Adequate Expert Inspection and the Issue of Stamps of Guaranty Covering the Origin of Tobacco Used in the Manufacture of Such Cigars Intended for Exportation and for Other Purposes.

The contention of the plaintiff is that it is a revenue law; that of the defendant that it is an inspection law. The two powers exist in every government, and are granted in the Jones Act to the government of Porto Rico. Section 37 of that act

provides that "the legislative authority herein provided shall extend to all matters of a legislative character not locally inapplicable." This does not, however, abolish the distinction between the two kinds of law, revenue and tax on the one hand, and inspection and police on the other. Cooley, Taxn. 1126, 1148. That is to say, Congress, deriving its power from the Constitution of the United States, can only confer what it has so acquired. In article 1 Congress is given, in § 8, the "power to lay and collect taxes, duties, imposts, and excises," while in § 10 of the same article it is provided that "no state shall without the consent of Congress lay any imposts or duties on imports or exports except what may be absolutely necessary for executing its inspection laws." In the Jones Act Congress has conferred analogous powers upon the insular government of Porto Rico. It may be added that, as a third principle entering into this case in the same § 8, Congress is given the power "to regulate commerce with foreign nations and among the several states;" but there is no contention that Congress delegated this power to Porto Rico.

The presumption is that legislation is constitutional. All doubts will be construed in favor of the proper exercise of its power by that co-ordinate department of government, whether it be the Congress of the United States or the legislature of the Island of Porto Rico. South & North Ala. R. Co. v. Morris, 65 Ala. 193.

The subject of inspection laws is an old one in American history. The standard definition of these is given in Gibbons v. Ogden, 9 Wheat. 1, 6 L. ed. 23. Chief Justice Marshall there declares: "The object of inspection laws is to improve the quality of articles produced by the labor of the country;

to fit them for exportation, or, it may be, for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. They form a portion of that immense mass of legislation which embraces everything within the territory of a state, not surrendered to the general government; all which can be most advantageously exercised by the states themselves." s. c. p. 203. These laws have covered meats, spirits, flour and meal, fish, tobacco, lime, naval stores, lumber, barrels, and other subjects of commerce, and the packages in which they are contained. They existed in the United States in colonial times, long before the Constitution was adopted, and have become increasingly common from the adoption of the Constitution down to the present time. Turner v. Maryland, 107 U. S. 51–54, 27 L. ed. 375, 376, 2 Sup. Ct. Rep. 44. They may prescribe the size and kind of barrel or other container, and need not provide for actual examination of the contents. s. c. 38 and 56. The only limit upon such laws is the limit implied in their name,—they must be limited as to weight, quantity, quality, and condition of the articles themselves,—regulations for the protection of the people of the state, and not principally revenue laws. D. E. Foote & Co. v. Stanley, 232 U. S. 503, 58 L. ed. 701, 34 Sup. Ct. Rep. 377. Policing and inspection are different duties.

The words, "imports" and "exports," used in the constitutional provision as to inspection laws, have been held to apply only to articles imported from or exported to foreign countries. Pittsburg & S. Coal Co. v. Louisiana, 156 U. S. 590, 600, 39 L. ed. 544, 548, 5 Inters. Com. Rep. 18, 15 Sup. Ct. Rep. 459; Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 350,

Porto Rico American Tobacco Co. v. Benedicto.

43 L. ed. 193, 18 Sup. Ct. Rep. 862. But this does not affect. the right of the state to pass inspection laws, for this is part of the police power of every state. It has been held that the right to make inspection laws has not been granted to Congress, but is reserved to the states. Neilson v. Garza, 2 Woods, 287, Fed. Cas. No. 10,091, quoted with approval in Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 355, 43 L. ed. 195, 18 Sup. Ct. Rep. 862. That statement was not necessary to the decision of the case, and at all events it is not to be construed as holding that Congress cannot confer such a power upon a territory of its own creation. A typical territory is a state in the making, and while it is not necessary to decide that the legislation of Congress shows a determination to admit Porto Rico as a state of the Union in the future, it is nevertheless true that Congress has conferred upon Porto Rico much the same governmental powers which it has conferred upon other territories which have later been admitted into the Union. It has been held that a territory can pass inspection laws. New Mexico ex rel. McLean v. Denver & R. G. R. Co. 203 U. S. 48, 51 L. ed. 85, 27 Sup. Ct. Rep. 1. And there is no reason to hold that the same power has not been conferred upon Porto Rico by Congress.

4. The act of the legislature in question may be either for revenue or for inspection, but the principles governing these two functions are so entirely different that it cannot be both. The title of the act would seem to indicate only an inspection law. The object is to protect from fraudulent misrepresentation Porto Rican cigars intended for exportation, effecting this by expert inspection and stamps guaranteeing origin. The provision that the act shall not contain more than one subject,

clearly expressed in its title, is not to be construed narrowly. This provision was not adopted to prevent the legislature from inserting in an act any provision germane to any general subject of the act, but rather to prevent surreptitious legislation by the union of incongruous matters having no natural relation to that subject. South St. Paul v. Lamprecht Bros. Co. 31 C. C. A. 585, 60 U. S. App. 78, 88 Fed. 449, 451. Legislation is often complex; and this constitutional provision should not be so narrowly construed as to embarrass legislation. State ex rel. Standish v. Nomland, 3 N. D. 427, 44 Am. St. Rep. 572, 57 N. W. 86. The object of such provisions is to prevent surprise upon legislators by passage of bills whose object is not indicated in the title, and to prevent the combination of several unconnected matters in the same bill; but it was "not intended to prohibit the uniting in one bill of any number of provisions having one general object, fairly indicated by its title. The unity of the object must be sought in the end which the legislative act proposes to accomplish. The degree of particularity which must be used in the title of an act rests in legislative discretion, and is not defined by the Constitution." Montclair Twp. v. Ramsdell, 107 U. S. 147, 27 L. ed. 431, 2 Sup. Ct. Rep. 391. The provision was meant to "prevent the use of deceptive titles as a cover for vicious legislation, by enabling members of the general assembly to form such opinion of the nature of a bill by merely hearing it read by its title." Carter County v. Sinton, 120 U. S. 517, 30 L. ed. 701, 7 Sup. Ct. Rep. 650. "This prohibition should receive a reasonable and not a technical construction, and, looking to the evil intended to be remedied, it should be applied to such acts of the legislature alone as are obviously within its spirit and meaning. None

of the provisions of the statute should be regarded as unconstitutional where they all relate directly or indirectly to the same subject." Ibid. This principle has been frequently held both in the Federal and state courts. Jonesboro v. Cairo & St. L. R. Co. 110 U. S. 192, 28 L. ed. 116, 4 Sup. Ct. Rep. 67; Mahomet v. Quackenbush, 117 U. S. 508, 29 L. ed. 982, 6 Sup. Ct. Rep. 858; Independent School Dist. v. Hall, 113 U. S. 135, 28 L. ed. 954, 5 Sup. Ct. Rep. 371. Many provisions of the Jones Act were taken from the Constitution of Colorado, from which state came the chairman of the committee in charge of the Senate bill. There a franchise tax was held properly to come within an act in relation to public revenue. American Smelting & Ref. Co. v. People, 34 Colo. 240, 82 Pac. 531. The license fee for the selling of liquor was held to be embraced within an act in relation to revenue. Parsons v. People, 32 Colo. 221, 76 Pac. 666. So, in Alabama, an act to establish an inferior court for Birmingham was held to include a system of hard labor in that city. Ex parte Birmingham, 116 Ala. 186, 22 So. 454. If there is unity of object indicated in the title, multifariousness of provisions does not infringe this provision of the Constitution. Cook v. Marshal County, 196 U. S. 262, 49 L. ed. 472, 25 Sup. Ct. Rep. 233.

5. The act being by its title, therefore, one for inspection, provisions for raising revenue cannot be contained within it. Are there such provisions? Laws as to inspection may, under the Constitution, contain provisions as to fees necessary for that purpose. Such is the wording of the Constitution itself. No doubt the primary and most usual object of inspection is preparing goods for exportation in order to preserve the credit of our exports in foreign markets. Neilson v. Garza, 2 Woods,

X. Porto Rico.—37.

287, Fed. Cas. No. 10,091, per Mr. Justice Bradley; Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 356, 43 L. ed. 195, 18 Sup. Ct. Rep. 862. The protection of citrus fruits, even by criminal law, is a proper exercise of the police power of Florida. Sligh v. Kirkwood, 237 U. S. 52, 59 L. ed. 835, 35 Sup. Ct. Rep. 501. The excessiveness of fees is held by Mr. Justice Bradley as not authorizing interference with an inspection law. Neilson v. Garza, supra. A fee of 25 cents on each package of tobacco, irrespective of size, has been upheld. Pace v. Burgess, 92 U. S. 372, 374, 23 L. ed. 657, 658. These provisions, however, cannot be extended and made a source of revenue. It is quite true that the courts will not strictly construe a law for the purpose of picking a flaw. If the expenses of enforcing the law are $1,000 and the income is $1,200, no question will be made. It might well be that the next year the revenue might fall off, although the expenses of enforcement were the same or higher.

"When the facts show that what was known to be an unnecessary amount has been levied, or that what has proved to be an unreasonable charge is continued, then [courts] are obliged to act in the light of those facts, and to give effect to the provision of the Constitution prohibiting the collection by a state of more than is necessary for executing its inspection laws." D. E. Foote & Co. v. Stanley, 232 U. S. 494, 504, 58 L. ed. 698, 701, 34 Sup. Ct. Rep. 377. "If, therefore, it is shown that the fees are disproportionate to the service rendered, or that they include the cost of something beyond legitimate inspection to determine quality and condition, the tax must be declared void." s. c. 504. In this case the statute imposed an inspection duty of 1 cent per bushel on oysters. Salaries amounted to fourteen hundred

Porto Rico American Tobacco Co. v. Benedicto.

dollars per year and annual revenues from the inspection were twenty odd thousand dollars in excess of the cost of administration.

In the case at bar the statute in question has been in force for several years. It cannot be told yet what will be the expenses of its enforcement as amended, but the utmost claim of the defendant is that it will amount to about twenty-one thousand, five hundred dollars. It is shown by officers of the plaintiff who are in position to know that the income derived from this defendant alone will amount to $150,000 annually, that is to say, vastly in excess of any possible expense of enforcement.

6. There are decisions to the effect that the courts will not take up the question of inspection legislation until the legislature has had time to see the working of the act in question and to amend or repeal it. Such is the effect of the case of State v. Bartles Oil Co. 132 Minn. 138, L.R.A.1916D, 193, 155 N. W. 1035. A legislature, however, like an individual person, must be presumed to intend the natural result of its own acts. State v. Standard Oil Co. 100 Neb. 826, L.R.A.1917D, 746, 161 N. W. 537. Courts do not go into the motives of legislators except as disclosed in the laws. Mugler v. Kansas, 123 U. S. 623, 31 L. ed. 205, 8 Sup. Ct. Rep. 273. The presumption that a statute is enacted in good faith for the purpose expressed in the title cannot control the final determination of the question whether it is repugnant to the Constitution. There may be no purpose to violate that instrument, and yet a statute by its necessary operation may be destructive of constitutional rights, and in such case the courts must sustain the supreme law of the land by declaring the statute void. Henderson v. New York (Henderson v. Wickham) 92 U. S. 259, 267, 23 L. ed.

543, 547; Minnesota v. Barber, 136 U. S. 313, 34 L. ed. 455, 3 Inters. Com. Rep. 185, 10 Sup. Ct. Rep. 862. In whatever language the statute may be framed, its purpose must be determined by its natural and reasonable effect. This principle is of general application, and will apply to health regulations, to inspection, and anything else. New York v. Compagnie Generale Transatlantique, 107 U. S. 59, 63, 27 L. ed. 383, 385, 2 Sup. Ct. Rep. 87. The duty of the court is not only to inquire in regard to a statute whether there is a substantial relation between its avowed objects and the means devised, but also whether, by its operation, it impairs rights secured by the Constitution.

There has been an evolution in judicial decisions in this regard. Mr. Justice Bradley in Neilson v. Garza, supra, suggested the doubt whether it is not exclusively the province of the legislative department, and not of the courts, to decide whether a charge or duty is excessive, and this quære is quoted without dissent in Turner v. Maryland, 107 U. S. 39, 27 L. ed. 371, 2 Sup. Ct. Rep. 44. It has been held that, if any inspection law is otherwise valid, the amount of the fee is not a judicial but a legislative question. Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 345, 43 L. ed. 191, 18 Sup. Ct. Rep. 862. It has been held that a prima facie charge for inspection, otherwise constitutional, is reasonable. Western U. Teleg. Co. v. New Hope, 187 U. S. 419, 47 L. ed. 240, 23 Sup. Ct. Rep. 204. If the inspection fees exacted average more than enough to pay expenses, the presumption is that the state will reduce them to the constitutional limit. Red "C" Oil Mfg. Co. v. Board of Agriculture, 222 U. S. 380, 56 L. ed. 240, 32 Sup. Ct. Rep. 152. Even earlier, however, it has been held in Brimmer v.

Porto Rico American Tobacco Co. v. Benedicto.

Rebman, 138 U. S. 83, 34 L. ed. 864, 3 Inters. Com. Rep. 485, 11 Sup. Ct. Rep. 213, that it is the duty of the courts to pass upon the question so as to protect the private citizen against the payment of fees larger than those authorized by the Constitution. It is not necessary to adjourn the matter over for future legislative action when the fees declared by law are so unreasonable and disproportionate to the services rendered as to attack the good faith of the law. New Mexico ex rel. McLean v. Denver & R. G. R. Co. 203 U. S. 55, 51 L. ed. 88, 27 Sup. Ct. Rep. 1. It is not allowable to mix up duties of inspection and duties of policing. Thus, the examination of oysters after they are gathered is inspection; while keeping trespassers away from oyster beds is policing, and the expense of the policing cannot be charged to the inspection service. Such confusion makes the law void. D. E. Foote & Co. v. Stanley, 232 U. S. 494, 58 L. ed. 698, 34 Sup. Ct. Rep. 377.

The modern statement of the principle, therefore, is that where it appears the amount of inspection fees is disproportionate to the inspection service rendered, the tax must be declared void as obstructing the freedom of interstate commerce, and this without waiting for an appeal to the legislature. Ibid. This is sometimes expressed as being a case where bad faith is apparent. It is doubtful whether it is necessary to infer bad faith on the part of the legislature in any case. Unquestionably if there was fraud in passing such an act it would be declared void, but the point in question is not the motive of the legislature, which generally is simply to obtain the results aimed at, but whether those results are illegal or obtained through illegal methods. It may well be that not only fraud, but either of the other two grounds of equity jurisdiction,—

accident and mistake,—would be sufficient to avoid a so-called inspection act which really amounts to a revenue measure. The actual name given, of course, is immaterial. It is not a question of names, but of results.

7. It is contended on behalf of the defendant that the plaintiff is to blame for the present situation in that the act in question provides only for an inspection fee for each package, and the plaintiff therefore can avoid injury by increasing the size of its packages so to be inspected. Physically there is no doubt that the plaintiff can pack its little cigars in any form it pleases, but the matter does not stop there. The object of packing the little cigars in any form is to sell them, and Porto Rico is not the only source of cigars similar to those in question. The plaintiff showed by sufficient evidence that the great consuming public of the United States is used to buying these little cigars in the package at present used, and the court is convinced that if the size of the package is enlarged the plaintiff would practically lose the sale of its product. It may be that the public is wrong in preferring its cigars packed in a certain way, but there is nothing more certain than that custom in trade, as in everything else, prescribes its own laws, which cannot be varied, no matter what an individual would prefer. The Porto Rican legislature cannot change the taste and customs of the tobacco consumers of the United States. It might as well attempt to place in competition with the yellow bananas from Central America, which this same public has become accustomed to using, those produced here, which may be equally pleasant to the taste, but do not ripen yellow and do not present the same attractive appearance to the eye. De gustibus non est disputandum. It is said that the Parliament of Great Britain can do

anything except make a man a woman or a woman a man, but even the Parliament of Great Britain would not be able to change the customs of trade, and the strength of Great Britain has been that legislation has rather followed and encouraged trade not only at home but all over the world. It would be an unreasonable, not to say impossible, demand to expect the plaintiff to change the size of its cigar packages under the evidence in this case.

8. A further objection is made to the act that it denies to the plaintiff due process of law under Amendment 5 to the Constitution of the United States, which declares that "no person . . . shall be . . . deprived of life, liberty, or property without due process of law." This amendment applies to action of the Federal Congress. The act complained of is one by the legislature of a territory created by the Federal Congress. If the treatment of Porto Rico by congressional action is to be considered as making it a quasi state, the same principle as to due process of law would nevertheless apply under the 14th Amendment, which declares in the same language: "Nor shall any state deprive any person of life, liberty, or property without due process of law." Life, liberty, and property are the three fundamental rights of citizens and, indeed, of foreigners, admitted by comity to the privilege of citizens, for it is another way of expressing the principle that all society rests upon the two foundations of persons and things, the third division, equally in civil and common law of actions, being merely a method of enforcing these rights through the courts. It may be remarked in passing that the division of life, liberty, and property comes directly to us from the Constitution of France of 1791, for the more abstract conception of the Declaration of

Independence, concerning life, liberty, and the pursuit of happiness, had given way to this more definite conception by the time of the American Constitutional Convention. The American Constitution, like the French, is based upon these two foundations of persons and property.

It is quite true that under the insular decisions Congress may extend to a territory not incorporated into the Union only so much of the Constitution as it sees proper, and that Porto Rico, as such a territory, may be dependent, therefore, upon the declaration of rights prefixed to the Organic Act. This, however, contains the same provision in § 2 that "no law shall be enacted in Porto Rico which shall deprive any person of life, liberty, or property without due process of law." As the inhabitants of Porto Rico by this same act, and the plaintiff by its incorporation, are American citizens, it is not to be conceived that provisions in the Bill of Rights of Porto Rico are to be construed in any different manner from those in the Constitution of the United States under which the insular government is created. Even where provisions are brought from different parts of the Constitution and embraced in one provision, as where general legislative power is given, each provision is to be considered as it is in the Constitution itself. Thus, constitutionally, taxation and police powers are to be considered separately, even though exercised in the Porto Rican legislature under one grant. In other words, as far as the Constitution has been brought to Porto Rico by Congress, Americans have the same rights and these rights are to be interpreted in the same way as on the mainland.

9. Under this principle the contention is correctly made that Porto Rico cannot tax interstate commerce. The occasion, if

Porto Rico American Tobacco Co. v. Benedicto.

not the object of instituting the Federal government, was the diversity of taxation and regulation by the individual states and the necessity for a general system. The word "national," as applied to this system, was struck out of the draft of the Constitution. Madison's Journal, Constitutional Convention, 199, 200, June 20, 1787. "Federal" has been the word commonly used, although it was not preferred in the Convention or used in the Constitution itself, and comes rather from the Federalist, which uses also "National" & "General." LVIII. But at least from the time of the 14th Amendment, when the powers of the judiciary were extended to prevent the interference of states with rights of individuals, the country has been a nation in every proper sense of the word, the governmental power for internal purposes being divided between the states and Congress. When states are forbidden, in art. I, § 10, of the Constitution to "lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws," and when at the same time it is declared in the preceding section that "no preference shall be given to any regulation of commerce to the ports of one state over those of another," and in art. 4, § 2, it is declared that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states," and when Congress exercises the power given in § 3 of art. 4 "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States," it is to be held conclusively that the national government cannot establish a territorial government, and it is not to be held as intending to establish a territorial government which shall have any greater privileges than the states themselves. A stream cannot rise higher than its source in constitutional, any more than in physical, matters.

Porto Rico American Tobacco Co. v. Benedicto.

There is no doubt of the power and the duty of a state to have proper inspection of the food of its people, a subject so important that Congress has had to come to the aid of the states. Virginia undertook the inspection of beef, veal, and mutton slaughtered a hundred miles from the place of sale, and an inspection duty of 1 cent per pound was held as a "discriminating tax imposed by a state operating to the disadvantage of the products of other states, . . . in effect, a regulation in restraint of commerce among the states and, as such, a usurpation of the powers conferred by the Constitution upon the Congress of the United States." Brimmer v. Rebman, 138 U. S. 78, 34 L. ed. 862, 3 Inters. Com. Rep. 485, 11 Sup. Ct. Rep. 213. It is not even necessary that it be a citizen of another state who complains. The people of the enacting state have as much right to protection against laws interfering with the freedom of commerce among the states as have the people of other states. Minnesota v. Barber, 136 U. S. 313, 34 L. ed. 455, 3 Inters. Com. Rep. 185, 10 Sup. Ct. Rep. 862. Upon the facts shown in this case the tax in question is not only so large as to be in no proper sense one for inspection, but it will raise the cost of cigar production so that, on the evidence, plaintiff cannot complete commercially in the national market at large. It is not perceived that it makes any difference whether the interference complained of is one with products to be imported into a state or one interfering with products to be exported from the state. The question is, in either case, whether it amounts to an interference with interstate commerce, for imports and exports are equally parts of that commerce. Indeed they are correlative, the export leaving one state being the import which reaches another state.

It is no objection that the inspection may, as said in Gibbons v. Ogden, 9 Wheat. 1, 6 L. ed. 23, have a remote and even considerable influence on commerce, if that be only incidental to real inspection for police purposes. As Chief Justice Marshall says in Brown v. Maryland, 12 Wheat. 419, 438, 6 L. ed. 678, 685, "Inspection laws, so far as they act upon articles for exportation, are generally executed on land before the article is put on board the vessel; so far as they act upon importations they are generally executed upon articles which are landed. The tax or duty of inspection, then, is a tax which is frequently, if not always, paid for service performed on land." Imported as well as exported goods may be subject to inspection. And they may be inspected as well to fit them for domestic use as for exportation.

10. When does the Interstate Commerce Law begin its application? The general principle is that it ceases to apply when the article has broken bulk and become a part of the general property of the state. The exact moment would be when the responsibility of the carrier ends, that is to say, when the owner accepts the goods, whether by receipt or otherwise. Conversely, it must apply when property has been taken out of the general property by acceptance by the carrier for transportation.

The question in this case, however, is broader. It is not a suit between owner and carrier about transportation; it is one of interference with commerce. It would be futile to limit this to the transportation; that could never affect more than the carrier. It is just as much an interference with commerce to prevent goods from getting to the carrier at all. Any law which calls for forfeiture of goods ready for transportation, or a fine or penalty which will prevent them from reaching the carrier,

or charges which will make it unprofitable to send the finished product to the carrier, interferes with interstate commerce. Like other impositions the power to tax in such manner is the power to destroy. That does not rest with the insular government in regard to whatever is the proper subject of interstate commerce. It may be that the provision in the Organic Bill of Rights (§ 3) "that no export duties shall be levied or collected on exports from Porto Rico," applies to shipments to foreign countries; the determination of this point is not necessary to adjudicating the question of injunction now presented. But if interference with interstate commerce probably exists, the injunction must issue, subject to dissolution if the facts do not sustain the prima facie case.

In the case at bar the stamp is not applied to the individual cigar, but to the finished package. Nothing is left to be done except putting the package in process of transportation. The expressed object of the law is to protect the reputation of Porto Rican cigars in markets outside of Porto Rico, and the only way they can get into the markets outside of Porto Rico is by what, for short, may be called interstate commerce. Whether the stamp is affixed just as the interstate packages are made up in the factory, or affixed as the packages are on the point of leaving the factory, the evidence does not show; nor would it be material, provided the packages are destined and segregated for interstate commerce. This is a necessity of the case, for stamps could not be affixed after the goods actually got into interstate transit. The affixing must be done before that begins, done practically at the last moment before it does begin. If for convenience it is done sooner, it is a matter of administration and not of law. And these facts are shown to exist in the case at bar, at least prima facie.

Porto Rico American Tobacco Co. v. Benedicto.

It follows, therefore, on the facts so far shown, that § 3 of the amended act for Porto Rico of December 3, 1917, seems to be an unconstitutional interference with the rights of the plaintiff in regard to cigars, large and small, manufactured by it, whether looked at from the point of view that the change as to fees was not expressed in the title, that the charges so made are excessive and are not inspection charges, that it amounts to interference with interstate commerce, or that it deprives the plaintiff therein of due process of law; and, therefore, a preliminary injunction must issue in its behalf against the defendant and persons acting by or through its authority, as prayed in the bill.

It is so ordered.